# EXHIBIT A

Yongmoon Kim (NJ Atty. ID #026122011)
KIM LAW FIRM LLC
411 Hackensack Avenue, Suite 701
Hackensack, New Jersey 07601
Tel. & Fax (201) 273-7117
*Attorneys for Plaintiff*

| | |
|---|---|
| LESROY E. BROWNE, *on behalf of himself and those similarly situated,*<br><br>  Plaintiff,<br><br>      vs.<br><br>NATIONAL COLLEGIATE STUDENT LOAN TRUST A/K/A NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3 AND NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4; WILMINGTON TRUST COMPANY AS TRUSTEE FOR NATIONAL COLLEGIATE STUDENT LOAN TRUST; U.S. BANK, N.A. IN ITS ROLE AS SPECIAL SERVICER FOR THE NATIONAL COLLEGIATE STUDENT LOAN TRUST; TRANSWORLD SYSTEMS, INC.; and JOHN DOES 1 to 15; and a class of Defendants similarly situated to the Defendant, National Collegiate Student Loan Trust.<br><br>  Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: HUDSON COUNTY<br><br>Civil Action<br><br><br>Docket No. HUD-L-1598-21<br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT and JURY DEMAND** |

## 1.   Nature Of The Case

1.     Plaintiff Lesroy E. Browne ("Browne") made payments to American Education Services ("AES") because it claimed to be entitled to collect the payments due under a student loan that he obtained from Chase Bank. While Browne previously took AES at its word, he later asked AES, in writing, to provide specific information concerning the loan including who is the "current creditor" of the loan. Browne had to ask because in prior communications AES never identified any specific entity other than stating that "NCT" was the owner of his loan and privacy disclosure notices sent to him referenced "NCSLT" that asked "WHAT DOES NCSLT DO WITH YOUR PERSONAL INFORMATION?"  Also, AES, when reporting the loan to a consumer reporting agency, lists "AES/NCT" as the creditor owed money.

2.      Despite his direct question, AES did not provide a specific answer to his specific question about who was the "current creditor" of the Chase loan. The account history provided by AES again only stated that "NCT" was the owner of the loan. AES did not provide any documents at all to show that "NCT" owned the loan. As explained more fully below, AES's failure to provide documents was not some oversight but because AES has no documents to show any assignment of Browne's Chase Loan to "NCT."

3.     The references to NCT or NCSLT by AES appears to be a generic reference to 15 statutory trusts that include "National Collegiate Student Loan Trust" in their names. Since AES refused to identify which of these specific entities allegedly owned his Chase loan, Browne has been forced to name all 15 of the statutory trusts as defendants in this action (collectively referred to as the "NCT Trusts"[1]) since contrary to AES's representations that it was representing and collecting

---

[1] The fifteen trusts are: National Collegiate Student Loan Trust a/k/a National Collegiate Student Loan Master Trust I,  National Collegiate Student Loan Trust 2003-1, National Collegiate

on behalf of the owner of his Chase Loan, Browne now believes that AES's statements were not accurate—it was not collecting for an owner of his Chase Loan and none of the 15 statutory trusts can prove that they are assignees of his Chase Loan.

4.      This is a putative class action arising from the Defendants'[2] coordinated efforts to enforce consumer debts that are allegedly unlawfully acquired by one or more of the Defendant NCT Trusts. It is not a question of which NCT Trust may be owed because Browne alleges that none of the NCT Trusts can prove that they are assignees of his Chase Loan and therefore Browne is entitled to recover the amounts he paid on the loans to AES as the servicer for the NCT Trusts and other relief.

5.      Browne also claims that even if any of the NCT Trusts were able to prove their assignee status, none had the right to collect from him since none first obtained a license to engage in business as a consumer lender or sales finance company, as required by the New Jersey Consumer Finance Licensing Act (CFLA), at N.J.S.A. 17:11C-3

6.      The collection efforts by the Defendants, directly or indirectly, make use of communications through statements of fact or affidavits that claim to be based on personal knowledge when they are not and the submission of documents that are not part of the original documents that are presented.

---

Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2006-3, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1, National Collegiate Student Loan Trust 2007-2, National Collegiate Student Loan Trust 2007-3 and National Collegiate Student Loan Trust 2007-4.

[2] All of the trusts have the same owners except one trust, National Collegiate Student Loan Trust 2003-1, which has one additional owner.  See Corporate Disclosure in *Browne v. National Collegiate Student Loan Trust*, *et al.*, No. 21-cv-11871-KM-MF (D.N.J.) at ECF No. 2.

7.     The methods used in the collection efforts described lead consumers, such as Browne, consumer reporting agencies and the courts to believe that the Defendant NCT Trusts, directly or indirectly, have the right to collect consumers debts when none of the Defendant NCT Trusts can prove their assignee status through competent and admissible evidence. The primary servicer used by the NCT Trusts is AES. Another servicer used by the NCT Trusts is Transworld Systems, Inc. ("TSI"), which is not licensed to service student loans in New Jersey.

8.     Further, none of the NCT Trusts are properly licensed so if they did acquire the loan accounts, they became void and unenforceable as of the date the NCT Trusts allegedly took assignment of them, pursuant to the CFLA, at N.J.S.A. 17:11C-33(b).

9.     As a result of the NCT Trusts inability to show that they have been assigned any specific student loans or as a result of the NCT Trusts' unlicensed status, the collection efforts by the Defendants are neither valid nor enforceable claims to collect on any student loans, including Browne or any other New Jersey student loan borrower.

10.     TSI's unlicensed status adds an additional reason why the Defendants' collection efforts are illegal and wrongful.

11.     Plaintiff and the putative class members are New Jersey consumers against whom Defendants have unlawfully sought to enforce consumer debts.

12.     Thus, Plaintiff brings this action on behalf of himself and a class of other New Jersey consumers whose consumer debts were (1) allegedly purchased by the NCT Trusts and the NCT Trusts cannot prove their assignee status; or (2) allegedly acquired by the NCT Trusts when they were unlicensed. They seek relief under the CFLA and the Consumer Fraud Act (CFA), including a declaratory judgment and injunctive relief that none of the NCT Trusts can prove their alleged assignee status and that the loan contracts are void and unenforceable, that any state court judgments

obtained on unlawful debts are unenforceable, and an injunction to enjoin any further attempts to enforce the Plaintiff and class members' loans  by the Defendants in this action or through agents of the Defendants.

13.     Additionally, the Plaintiff seeks monetary damages on behalf of a subclass of consumers from whom Defendants collected any money on the debts for which they cannot prove their assignee status or collected any money on unenforceable consumer debts, including treble damages under the CFA, and disgorgement based on unjust enrichment.

14.     The claims of Plaintiff and the proposed class and subclass are directly related to Defendants' collection efforts.

15.     The *Rooker Feldman* doctrine may not permit a federal court to provide the relief sought by Plaintiff individually and on behalf of the proposed class and subclass.

## 2.     JURISDICTION & VENUE

16.     Jurisdiction is proper since the acts complained of affected New Jersey residents and the activities were governed by applicable New Jersey law.

17.     Venue is proper in Hudson County because Defendants regularly conduct business there, including the filing of collection actions against New Jersey residents.

## 3.     PARTIES

18.     Plaintiff, Lesroy E. Browne, is a natural person.

19.     At all times relevant to this lawsuit, Plaintiff was a citizen of the State of New Jersey.

20.     The "NCT Trusts" include National Collegiate Student Loan Master Trust a/k/a National Collegiate Student Loan Master Trust I, National Collegiate Student Loan Trust 2003-1, National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2,

National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1,

National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2006-3,

National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1,

National Collegiate Student Loan Trust 2007-2, National Collegiate Student Loan Trust 2007-3, and

National Collegiate Student Loan Trust 2007-4. The above are, upon information and belief, a

Delaware statutory trust and its beneficiaries include NC Residuals Owners Trust, two unnamed

foreign nationals, VCG Special Opportunities Master Fund Ltd. and VCG Securities LLC.[3]

21.     The NCT Trusts are controlled and operated at the direction and control of certain

Trustees.

22.     The "Owner Trustee" is the Defendant Wilmington Trust Company ("Wilmington").

Wilmington's role as Trustee is separate and apart from its consumer banking activities. As the

"Owner Trustee" for the Trusts it acts solely on behalf of the investors who purchase offered notes

or shares of the Trusts. To fulfill its role of Owner Trustee, it depends on collections being made of

the student loans allegedly acquired by the NCT Trusts. Wilmington Trust Company is a wholly

owned subsidiary of Manufacturers and Traders Trust Company (d/b/a/ M&T Bank), whose primary

place of business is in Buffalo, New York.

23.     The Special Servicing Trustee is the Defendant, U.S. Bank N.A. ("U.S. Bank"). U.S.

Bank is a National Banking Association which does business in Hudson County, New Jersey. As

Special Servicing Trustee its role is to manage collection of the loans allegedly acquired by the

Defendant Trust and the other trusts. U.S. Bank's role as Special Servicing Trustee is separate and

apart from its consumer banking activities. To fulfill its role as Special Servicing Trustee, it must

collect on the student loans allegedly acquired by the Defendant Trust and the other trusts.  U.S.

---

[3] See n.2.

Bank also serves as an Indenture Trustee and acts on behalf of certain note holders of the NCT

Trusts. To fulfill its role of Indenture Trustee, it depends on collections being made of the student

loans allegedly acquired by the NCT Trusts.

24.     These Trustees in turn hire or retain the services of various entities including

Turnstile Capital Management, LLC ("Turnstile"), TSI, GSS Data Services, Inc. ("GSS") and AES.

25.     Despite the retention of these parties by the Trustees, the Trustees are both

contractually and legally responsible for actions taken to collect on the student loans allegedly

acquired by the NCT Trusts and fulfilling their role is dependent on collecting on the student loans

allegedly acquired.

26.      Based on publicly available documents and information and belief, the NCT Trusts

are separate entities but in reality, they are treated and operated as a single entity by the Defendants

through the Trustees and persons hired or retained by the Trustees. The NCT Trusts use

instrumentalities of interstate commerce, or the mails, and the principal purpose of its business is the

collection of any debts.

27.     Defendant Transworld Systems, Inc. ("TSI") is a debt collector which acts directly at

the direction and control of U.S. Bank as the Special Servicing Trustee for the NCT Trusts and is

engaged in the business of a collection agency, using the mails and telephone to collect consumer

debts allegedly owed to others. TSI is a corporation chartered under California law with offices at

507 Prudential Road, Horsham, Penn., 19044. TSI does business in New Jersey, and its registered

agent in New Jersey is CT Corporation System, 820 Bear Tavern Road, West Trenton, New Jersey

08628.  TSI is not licensed as a student loan servicer in New Jersey. TSI is licensed to do business in

the state of New Jersey under Entity ID No. 0100155233.

28.     Defendants John Does 1 to 15 are natural persons and/or business entities created by

the Defendant or its beneficiaries and affiliates, all of whom reside or are located within the United

States (excluding the two unnamed foreign nationals) and were personally created, instituted and,

with knowledge that such practices were contrary to law, acted consistent with and oversaw policies

and procedures used by the employees of Defendants that are the subject of this Complaint. Those

defendants personally control the illegal acts, policies, and practices utilized by Defendants and,

therefore, are personally liable for all of the wrongdoing alleged in this Complaint. Those fictitious

names of individuals and businesses alleged for the purpose of substituting names of defendants

whose identity will be disclosed in discovery and should be made parties to this action.

29.     Some or all of John Does 1-15 set the policies and practices complained of herein.

30.     Some or all of John Does 1-15 were actively engaged in the practices complained of

herein.

31.     In this pleading, "Defendants" in the plural refers to all Defendants individually and

collectively.

### 4.   FACTUAL ALLEGATIONS

#### *4.1*   **Background**

##### *4.1.1*   *Origination of the Loans*

32.     An entity known as First Marblehead Corporation ("FMC") saw an opportunity to

make high-cost, high interest, purported loans to students (for purposes generally but not for tuition

or actual educational expenses).

33.     FMC did not have the reputation, credibility or ability to attract borrowers and even if

it did, it could not do so because it would become subject to complying with the laws in each state as

a non-bank entity.

34.     To avoid the consequence of the previous paragraph, FMC devised a business plan by

which it would entice national banks to lend their charters to a marketing operation to be conducted

by FMC for the banks. Other than lending their name, the banks had no meaningful involvement in the loans. FMC itself identified this "rent a charter" scheme as a potential liability issue in its own 2007 annual report. *See* Exhibit A.

35.   As part of its rent a charter scheme, FMC enlisted a purported non-profit entity to act as the guarantor for the high-cost loans which would allow FMC to convince the banks that there would be little risk arising out of the loans. Specifically, FMC convinced The Education Resources, Inc. ("TERI") to be the guarantor for any purported student loans that went into default.

36.   FMC was able to convince TERI to become involved, because like the arrangement with the banks, FMC promised it would do all the work connected with the marketing and generation of the loans. To this end, FMC and TERI entered into a series of management agreements that included managing database operations for TERI. TERI would become the depository of the original documents relating to the loans made in the names of the participating banks.

37.   As a result of its plan and program to rent the bank charters and enlist the endorsement of TERI, FMC ended up being paid over a $1,000,000,000.00 (one billion dollars) in fees for its efforts from the Trusts before the Court in this action. FMC caused the NCT Trusts to be created.

38.   In 2008, the Great Recession hit and TERI filed bankruptcy (in part because the toxicity of the high-cost loans led to massive defaults). The relationship between FMC and TERI disintegrated and eventually a lawsuit between TERI and FMC was filed in the bankruptcy court post-bankruptcy and gave control over TERI's loan database to TERI. *See* Exhibit B. This created a problem for FMC that FMC never foresaw: TERI ended the relationship and retained the records related to the loans it owned under the arrangement created by FMC. In other words, FMC no longer had access to the actual loan records.

39.     The FMC-arranged-loans that are the subject of this action were allegedly assigned to 15 Delaware statutory trusts described as the NCT Trusts who are the Defendants in this action. None of the NCT Trusts have any employees. They all are treated the same by their co-Defendants and other than a numeric designation, there is nothing to distinguish between the NCT Trusts.

40.     A number of Non-Trust parties collectively acted directly or indirectly in the name of the NCT Trust Defendants.

### 4.1.2   *U.S. Bank's Role In Debt Collection For The Trusts*

41.     U.S. Bank serves two roles in connection with the Trusts. First, it is the Indenture Trust of the Trusts. It serves as the Indenture Trustee for a series of Indenture Agreements that were created as part of the transactions for the benefit of the purported investors/note holders. Second, it serves as the Special Servicer for the NCT Trusts.

42.     As the Special Servicer, U.S. Bank is responsible for the collection of the loans allegedly held by the NCT Trusts. It is in this second role as Special Servicer that the claims are asserted against it by the Plaintiff and putative class members in this action since it is the ultimate decision maker and controller of the collection actions pursued on behalf of the Trusts (whether those decisions are made directly or indirectly through a servicer, subservicer or the people they hire, including attorneys, to collect on behalf of the Trusts). It is true that U.S. Bank has placed intermediaries between it and others in the collection chain commanded by U.S. Bank, but it remains in legal and ultimate control no matter how long the chain of the parties engaged in collecting on behalf of the NCT Trusts may become.

43.     U.S. Bank continues to have responsibility for any collection actions taken in the name of the NCT Trusts and the focus of this action. U.S. Bank's reservation of responsibility is demonstrated by U.S. Bank providing indemnification to the servicer (and others) for the information or materials provided to the servicers/collectors for their use in their collection and

services. *See* Exhibit C.

44.     The documents provided to the servicers under their servicing agreements are very narrow and limited to the "Original Credit Agreement" which refers to the signed first or first two pages of the Credit Agreement and related documents. There is no requirement to provide the servicer the terms and conditions of the "Original Credit Agreement" and there is no mention of any obligation to provide any documents relating to the assignments of the Credit Agreements.

45.     As the Third Circuit noted in *In re National Collegiate Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*, 971 F.3d 433, 440 (3rd. Cir. 2020), "[t]he Basic Documents at the outset did not provide for servicing loans delinquent in their payments because The Educational Resources Institute Inc. (the "Resource Institute") guaranteed full repayment on those loans. After that entity's bankruptcy in 2008, however, the Trusts established a regime for servicing delinquent student loans."

46.     As the Special Servicer, U.S. Bank also provides certain services for loans that are either delinquent for more than thirty days or deemed to be in default. Among other services it provides, U.S. Bank also:

  a.   retains debt collection agencies known as "subservicers" to enforce and collect delinquent and defaulted student loans;

  b.   audits the Subservicers and provide oversight with respect to account management, litigation assistance, and settlement strategies;

  c.   replaces any subservicer whose performance is deficient;

  d.   requires each Subservicer to submit monthly reports relating to the loans on which the Subservicer is collecting; and

  e.   retains responsibility for the information relating to the loans through

indemnification liability.

40.     As Special Servicer, U.S. Bank has allowed collection of loans in New Jersey when

the actors are not properly licensed to engage in the lending business and servicing of student loans

to be done without proper licensing of entities required to be licensed.

41.     U.S. Bank has also actively participated in litigation concerning the right to control

the collection activities of the Trusts and determining who may collect on behalf of the Trusts. U.S

Bank was a party and appealed an adverse decision against the Trusts in *In re National Collegiate*

*Student Loan Trusts 2003-1, 2004-1, 2004-2, 2005-1, 2005-2, 2005-3*, 971 F.3d 433 (3rd. Cir. 2020).

It continues to participate, after intervening in a District Court action, *Consumer Financial*

*Protection Bureau, Plaintiff, v. National Collegiate Master Student Loan Trust et al. Defendants*,

No. 1:17-cv-1323-SB, 2021 WL 5936404 (D. Del. Dec. 13, 2021), motion to certify appeal granted

sub nom. *Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Loan Tr.*, No. 1:17-CV-

1323-SB, 2022 WL 548123 (D. Del. Feb. 11, 2022), which adopted that its role as a special servicer

was "to collect 'past due and defaulted student loans' and to do 'collections litigation.'" *Id.* at *1.

42.     U.S. Bank has also moved to intervene—claiming a right to do so—in actions against

certain Trusts that sought to limit the rights of Trusts to pursue collection actions or use particular

collectors.

43.     Yet, despite its voluntary involvement in litigation concerning the collection actions

filed in the name of the Trusts, U.S. Bank claims it has no involvement and is far removed from

collection activities based on contractual terms of the Special Servicing Agreement governing its

involvement. U.S. Bank's interpretation of a limited role conflicts with the statement included by the

Third Circuit that "[t]he Special Servicing Agreement further provided that Defaulted Loans are

serviced exclusively by the Special Servicer. …"  The Third Circuit also noted the contention that

collection lawsuits filed in the names of the Trusts were "lawsuits filed by U.S. Bank on behalf of

the Trusts against borrowers for collection on Defaulted Loans were dismissed due to faulty

documentation and procedures."  *In re Nat'l Collegiate Student Loan Trs. 2003-1, 2004-1, 2004-2,*

*2005-1, 2005-2, 2005-3*, 971 F.3d 433, 440 (3rd. Cir. 2020)

44.     U.S. Bank's decisions to intervene or voluntarily participate in litigation concerning

the collection actions, including collection suits, shows its direct and indirect involvement in the

management and control of the Trusts' collections activities in its role as Special Servicer.

### 4.1.3   *Servicing Of The Loans*

45.     TERI was to provide the Original Credit Agreement it had possession of to a servicer

hired for the Trusts known as American Education Services ("AES") which is also known as the

Pennsylvania Higher Education Assistance Agency ("PHEAA"). AES was the primary servicer for

nearly all of the loans that the Trusts claim to own.

46.     In a Service Performance Report of AES in 2015, an independent reviewer, Boston

Portfolio Advisers concluded TERI failed to deliver essential documents and AES had no way of

knowing what they had not received, nor could AES provide any personal knowledge concerning

any of the records. *See e.g*., New York Times Article, <u>National Collegiate's Audit of P.H.E.A.A</u>,

July 17, 2017 ("The beneficial owner of National Collegiate's student loan trusts conducted an audit

of the loans' servicer. Crucial paperwork needed to collect on the loans in court is missing,

according to the auditors' report.") The Service Performance Review conclusions verified that:

> 100% of the accounts [randomly selected] did not contain an
> Assignment. It is unknown whether Assignments were appropriately
> issued. Based on the representations made by PHEAA [another acronym
> for AES] it is likely that the assignments do not exist.

47.     This explains why AES did not provide any assignments when Browne asked about

the current creditor. The Servicer Performance Review also prophetically concluded "[w]ithout

appropriately issued Assignments, collection efforts are more challenging and costly to defend in Court."

48.     Because AES lacks documentation of any assignments, AES cannot support the claims of assignee made on behalf of any of the NCT Trusts. This lack of proof of assignee status is never disclosed and is a material omission.

49.     AES's lack of knowledge also extends to knowing which loans are allegedly owned by which NCT Trust. The Servicing Performance Report also noted that:

> PHEAA [a/k/a AES] is not aware of the criteria FMC used for assigning a batch of loans to any given trust except the general knowledge that FMC was able to package loans to appeal to investors. PHEAA would change the owner on its system upon notification from FMC. Loans were not bundled by disbursement year or period (i.e. the 2007 trust does not contain all loans originated in the 2006-2007 academic year) and the criteria that FMC used to formulate the trusts was never disclosed to PHEAA. The first trust (National Collegiate Master Student Loan Trust) was replenished with 6 independent securitizations from 2001 to 2006, while the other 14 trusts were one and done transactions. The early disbursements were all direct to consumer and mainly with Chase Bank and Bank One.

50.     AES's lack of knowledge as to which loan is owned by which trust is confirmed by AES's practice of referencing "NCT" in communications to borrowers and in credit reporting to consumer reporting agencies. AES's lack of knowledge is not disclosed by AES when it demands payments, which is a material omission.

51.     All collectors relying on AES's information lack proof to show the Defendant NCT Trusts' ownership of any individual loan accounts. They also lack any ability to prove which NCT Trust allegedly owns which individual loans.

52.     But AES and other collectors acting on behalf of the NCT Trusts nevertheless claim to have knowledge of the individual loans and what NCT Trust owns which individual loan—when AES has incomplete and deficient records to make such claims. The various collectors, and the

Defendants in this action, also claim to have personal knowledge of information concerning the individual loans and alleged transfers of individual loans when none of them had any direct relationship or records that would provide any basis for personal knowledge of the individual loans the Trusts claim to own.

53.     TSI was appointed a special subservicer of the 15 Delaware statutory trusts. As special subservicer, it is subject to the control of U.S. Bank for whom it acts. Both U.S. Bank and TSI are agents of the NCT Trusts by other agents of the NCT Trusts.

54.     As special subservicer, TSI allegedly oversees the collection of student loans that go into default. Only after a loan has gone into default is TSI first granted access to AES's records—the same incomplete and materially deficient records as explained above. But TSI's records are no greater than the records of AES.

55.     TSI's involvement is allegedly after default. TSI's efforts to collect include mass litigation in state courts when it knows the AES records it relies on are incomplete and materially deficient. TSI also alters the documents that it presents to borrowers and files before courts as explained below.

56.     TSI knows that to convince borrowers or enforce the loans before courts it would have to present competent and admissible evidence.

57.     But the series of events described above leaves both AES and TSI with incomplete and deficient records or any ability to credibly claim any personal knowledge since it was not involved in the origination or alleged assignment of the loans; and reliance on AES's incomplete and insufficient records to prove the Trusts' ownership of any loans is inadequate.

58.     The natural consequences of attempting to collect in the courts without the required proof that is required of every other party in a similar position cannot be overcome.

59.     TSI tries to overcome the lack of admissible evidence by preparing and submitting affidavits by its employees that say they are based on "personal knowledge" when they are not.

60.     TSI's collection practices of knowingly and willfully using of affidavits that are wrongfully claimed to be based on personal knowledge were addressed by the federal Consumer Financial Protection Bureau ("CFPB"). The CFPB's public enforcement action (2017-CFPB-0018[4]) identified the defects in TSI's efforts to collect the student loans in a September 15, 2017 Stipulation and Consent to the Issuance of a Consent Order ("Transworld Stipulation") and a Consent Order In the Matter of Transworld Systems, Inc. ("Transworld Consent Order") as a result of actions taken on behalf of the 15 NCT trusts and for which Wilmington serves as Trustee. *See* Exhibits D and E.

61.     The Transworld Consent Order was issued specifically as to TSI's unfair and deceptive acts and practices on behalf of, or in the name of the NCT Trusts. The TSI Consent Order is both remedial and mandatory; it identified and prohibited many of the unfair and deceptive acts and practices of TSI on behalf of, or in the name of the NCT Trusts.

62.     In the TSI Consent Order, the CFPB found that TSI and its nationwide network of law firms committed a number of offenses between November 1, 2014, and April 25, 2016, including:

a.      filing tens of thousands of collections lawsuits against borrowers in which they did not possess the complete documentation needed to prove the NCT Trusts owned the loans;

b.      filing tens of thousands of affidavits in support of collections lawsuits in which the affiant swore they had personal knowledge of the debt, when in fact the affiants

---

[4] https://files.consumerfinance.gov/f/documents/201709_cfpb_transworld-systems_consent-order.pdf

frequently merely reviewed data on a computer screen, did not know the source of the data or how it was collected and maintained, and lacked knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the loans;

c.      Filing numerous lawsuits without the intent or ability to prove the claims, if contested.

63.      The TSI Consent Order further found that these acts constituted violations of the Consumer Financial Protection Act, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

64.      The Consent Order also referenced the supervising role to be played by the Special Servicer, U.S. Bank, to issue directives to TSI including requiring disclosures in connection with debt collection efforts in the name of the Trusts, to withdraw any affidavits or collection suits, provide information to the Special Servicer. Transworld Consent Order at ¶ 51.

65.      Despite the Transworld Consent Order, TSI has continued to conduct "business as usual" and engage in the same wrongful behavior.

66.      TSI also provides documents that are prepared for litigation and filed in court actions filed in the names of the Trusts. These documents include adding documents to various agreements. The primary document that allegedly shows that the Trusts have interests are Pool Supplements. The Pool Supplements reference a schedule of loans that is attached to the Pool Supplement Agreement. Since TSI does not have the loan schedules that were attached to the Pool Supplement Agreements, TSI has instituted the use of what it calls a placeholder—a document that claims that the listing of the loans being transferred are on file with FMC. This is not part of the original agreement but has been added to the document to leave the false, unfair, and deceptive impression to the Plaintiff, putative class members, and the state courts—that the Trusts have a valid interest in the loans when they do not.

67.     Since the "placeholder" does not identify any specific loans, TSI adds an excerpt of an additional document that it attaches to the Pool Supplement labeled a "roster." This is not a document included as part of the original Pool Supplement transferred from anyone to the Trusts.

68.     TSI's practice of attaching this "roster" document has been addressed by the New York Attorney General that found the roster "is a document TSI *created* for the specific litigation by copying identical text and data from a large spreadsheet with multiple accounts and pasting it into a new account-specific document . . . . [and] TSI's description of a newly-created document as a 'redacted' version of the original document may confuse consumers about the nature and legal status of the debt, impede consumers' ability to respond to the lawsuit, and influence consumers to settle rather than litigate (or to settle on less favorable terms than they would otherwise accept)." *See* New York Attorney General Assurance of Discontinuance at ¶¶ 21 and 22.[5]

69.     TSI also represented in that Assurance "that TSI has ceased identifying excerpts of loan rosters cut and pasted into new documents as "redacted" versions of original loan rosters." *Id.* at ¶ 23. That representation is untrue since TSI continues to alter the Pool Supplement documents in court proceedings against the Plaintiff and putative class members by adding rosters to it and pretending the roster is part of the original document when it is not.

70.     TSI's designation of what NCT Trusts claim to own a particular loan is nothing more than guesswork since TSI (nor AES) has any actual knowledge, personal or otherwise, as to the ownership of any individual loans by any particular NCT Trust.

71.     This practice by the NCT Trusts with the approval, knowledge and consent of U.S. Bank as Special Servicer and TSI as Special Subservicer has been confirmed by the investigation of

---

[5] The document is available at https://ag.ny.gov/sites/default/files/09.11.2020_tsi_aod_final.pdf

its practices by Massachusetts Attorney General[6] which concluded:

> 37. Transworld executed certain Affidavits for use in Collection Lawsuits that stated a particular student loan was owned by a Trust, when, in fact, Transworld did not possess sufficient documentation to establish the chain of title of the particular loan.

> 38. From November 1, 2014 through April 25, 2016, Transworld's representations contained in certain affidavits had the tendency to mislead Consumers to believe that Transworld and Law Firms representing the Trusts possessed the relevant documentation sufficient to support the assertions in the Affidavit and that the Debt was valid and accurate.

72.    Given the uncertainty of what NCT Trust allegedly owns what individual loans, the NCT Trusts are treated as a single entity in collection efforts. The same acronyms, e.g., NCT or NCSLT, are used in communications with borrowers and in reporting the loans to consumer reporting agencies.

73.    The Defendants have worked in concert together and collectively orchestrated means and methods of collection to unfairly, deceptively, illegally collect and attempt to collect allegedly owed debts from the Plaintiff and class members. In addition to the facts found by the investigations discussed above, the issue of the Trusts' reliance on claims of personal knowledge made by employees of TSI has already been litigated in courts and resolved against the Trusts by a court of competent jurisdiction that estops the Defendants from contesting their liability for pursuing collection lawsuits without sufficient or competent evidence to sue individuals.

### 4.2    Allegations Regarding Defendants' Practices Generally

74.    The NCT Trusts are in the business of allegedly purchasing and taking assignment of student loan credit accounts originally extended by other creditors, which they then seek to enforce

---

[6] The document is available at https://www.mass.gov/doc/transworld-systems-aod/download

against the borrowers through collection letters, lawsuits, and post-judgment collection efforts. This is their principal business.

75.     In the course of their business, the NCT Trusts have allegedly purchased and taken assignment of numerous student loan credits accounts originally extended by banks or others to New Jersey consumers which were primarily for personal, household, or family purposes.

76.     All or substantially all of the accounts of which NCT Trusts allegedly took assignment extended credit of less than $50,000 and provided for rates of interest and/or other charges beyond those authorized by the New Jersey Consumer Finance Licensing Act, at N.J.S.A. 17:11C-1 to -49 for licensed consumer lenders.

77.     In the course of their business, the NCT Trusts have enforced their allegedly assigned accounts against New Jersey consumers through servicing, collection letters, lawsuits, and post-judgment collection efforts. The NCT Trusts rely on the other Defendants for these efforts since they do not have employees.

78.     Defendant TSI acted as a student loan servicer during times when a license was required but TSI did not have a license.

79.     While the Defendant NCT Trusts claim to have purchased student loan credit accounts, they cannot show that they are assignees of any particular loan and instead use false or misleading statements in the course of their collection efforts consisting of demands, invoices, statement, dunning letter or lawsuits.

80.     By allegedly purchasing and taking assignment of the accounts, Defendant NCT Trusts acted as a "sales finance company" as defined at N.J.S.A. 17:16C-1(f).

81.     By allegedly purchasing, taking assignment of, and/or enforcing the accounts, Defendant NCT Trusts engaged in the "consumer loan business" as defined at N.J.S.A. 17:11C-2.

82. During all times relevant to this action, Defendant NCT Trusts were not licensed as a "sales finance company" or a "consumer lender" pursuant to the CFLA, at N.J.S.A. 17:11C-3.

83. TSI has also acted as a student loan servicer for the Defendant NCT Trusts without a license when a license was required.

### 4.3   *Plaintiff Browne*

84. In 2007, Browne entered into a student loan agreement with JP Morgan Chase Bank ("Chase Loan").

85. The Chase Loan was for personal, family, or household purposes.

86. Between June 2017 and June 2020, Browne made payments pursuant to AES's communications that represented "NCT" was entitled to collect the amounts allegedly due under the Chase Loan.

87. In an attempt to collect the Chase Loan, Defendants, through AES, reported the account to a major credit reporting agency, TransUnion, and possibly other credit reporting agencies. AES reported that the loans were owned by "AES/NCT."

88. Defendants engaged in collection activities against Plaintiff when the Defendant NCT Trusts were not properly licensed to do so under the New Jersey Consumer Finance Licensing Act or any other New Jersey consumer lending statute.

89. Defendants' continued collection attempts caused Plaintiff to make payments to them for the Chase Loan between June 2017 and June 2020. There may be more payments outside those periods.

90. Each collection made by Defendants was wrongful and illegal.

91. As a result of Defendants' unlawful actions, Plaintiff has suffered an ascertainable loss, specifically the amount that Plaintiff paid Defendants towards the Chase Loan when the

Defendant NCT Trusts were unable to show it was assigned his loan.

92.     Defendants' collection or enforcement of the Chase Loan, whether it was actually acquired by Defendant NCT Trusts or not, was unauthorized and unlawful because Defendant NCT Trusts did not have a license to engage in business as a "sales finance company" or a "consumer lender" pursuant to the CFLA, at N.J.S.A. 17:11C-3.

93.     Any alleged assignment of the Chase Loan to any Defendant NCT Trust was void upon assignment to any Defendant NCT Trust, pursuant to N.J.S.A. 17:11C-33(b).

94.     Defendant NCT Trusts also did not have the legal right to enforce any student loan against Plaintiff since it was unable to show that it was assigned the loan.

95.     During the six years prior to the date when Plaintiff's Complaint was filed, numerous New Jersey consumers made payments to Defendants for accounts that Defendant NCT Trusts claimed were assigned to them when they were not properly licensed under the New Jersey Consumer Finance Licensing Act—the Defendant NCT Trusts were unable to show they were assigned specific loans through competent and admissible evidence.

96.     During the six-year period prior to the date when Plaintiff's Complaint was filed, Defendants collected money, directly or indirectly, from Plaintiff and the proposed class as a result of collection activities on accounts claimed to have been acquired when the Defendant NCT Trusts were not properly licensed—the Defendant NCT Trusts were unable to show they were assigned specific loans through competent and admissible evidence.

### 5.     CLASS ACTION ALLEGATIONS

(Plaintiff Class)

97.     Plaintiff brings this action individually and as a class action on behalf of all others similarly situated pursuant to Rule 4:32 of the New Jersey Rules of Court.

98. Subject to discovery and further investigation which may require Plaintiff to modify the following class definition at the time Plaintiff moves for class certification, Plaintiff seeks certification of a class and a subclass initially defined as follows:

> **Class**: All natural persons with addresses in the State of New Jersey who are listed as the borrower or purchaser in any account allegedly assigned to Defendant Trust, or any of its servicers, collectors, sister, affiliated or parent entities.
>
>> **Subclass**: All members of the Class who paid any money or from whom Defendant Trust or any of its or any of its servicers, collectors, sister or parent entities, directly or indirectly through any agents or contractors, collected any money on the allegedly assigned account.

99. Plaintiff seeks to recover declaratory relief on behalf of the class and attorney's fees and costs to the extent allowed by law.

100. Plaintiff seeks to recover statutory damages, actual damages, restitution and attorney's fees and costs on behalf of himself and all subclass members under the claims asserted herein.

101. The Class and Subclass for whose benefit this action is brought is so numerous that joinder of all members is impracticable.

102. There are questions of law and fact common to the members of the Plaintiff Class and Subclass against the Defendants and the proposed Defendant Class that predominate over questions affecting only individuals, including but not limited to:

> A. Whether Defendants are "persons" subject to the requirements of the CFA;
>
> B. Whether Defendants' attempted collection of consumer debts from Plaintiff and those similarly situated constitutes the subsequent performance of the sale of merchandise within the meaning of the CFA at N.J.S.A. 56:8-2;
>
> C. Whether Defendants' attempted collection of consumer debts from Plaintiff and those similarly situated was made in connection with the sale of merchandise within the meaning of the CFA at N.J.S.A. 56:8-2;

    D.    Whether Defendants' communications asserting that it had allegedly acquired certain loans between Plaintiff and the Class and others, when the assertion could not be shown to be true constitutes an unconscionable commercial practice, deception, fraud, false promise, false pretense and/or misrepresentation in violation of the CFA at N.J.S.A. 56:8-2;

    E.    Whether Defendants' attempts to collect consumer debts allegedly acquired when it was not properly licensed constitutes an unconscionable commercial practice, deception, fraud, false promise, false pretense and/or misrepresentation in violation of the CFA at N.J.S.A. 56:8-2;

    F.    Whether any judgments entered on cases filed when the Defendant NCT Trusts were not properly licensed are unenforceable;

    G.    Whether any actions of TSI against any class member on behalf of the Defendant NCT Trusts were lawful since it did not have a license to service student loans during the time frame the law required it;

    H.    The amounts that the Subclass are entitled to recover from Defendants for damages, disgorgement and restitution.

    I.    Whether the Plaintiff and the Plaintiff Class are entitled to declaratory and injunctive relief against the Defendants.

103.    There are questions of law and fact common to the members of the Subclass that predominate over questions affecting only individuals, including but not limited to:

    A.    The common issues for the class and subclass set forth above.

    B.    The equitable relief that they may be entitled to relating to amounts collected from them on judgments entered on cases for accounts allegedly acquired by the Defendant NCT Trusts when it was not properly licensed including, pursuant to the CFA at N.J.S.A. 56:8-19;

    C.    Whether Plaintiff and those similarly situated suffered an ascertainable loss in the form of all amounts paid to Defendants or their agents as a result of Defendants' collection attempts including filing civil collection complaints on accounts allegedly acquired when it was not licensed or unable to show ownership of loans through admissible evidence;

    D.    Whether Plaintiff and those similarly situated are entitled to treble damages for all ascertainable losses incurred pursuant to the CFA at *N.J.S.A.* 56:8-19.

    E.    What relief may be obtained based on any actions taken by TSI when it was required to be licensed but was not.

104.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. A class action will cause an orderly and expeditious administration of the claims of the Class and Subclass and will foster economies of time, effort and expense by avoiding thousands of individual suits that will be based on the same legal theories that can be resolved in a single proceeding.

105.     Plaintiff's claims are typical of the claims of the members of the Class and the Subclass. He is member of both the Class and Subclass.

106.     The questions of law and/or fact common to the members of the Class and Subclass predominate over any questions affecting only individual members.

107.     Plaintiff does not have interests antagonistic to those of the Class and Subclass.

108.     The Class and subclass, of which Plaintiff is a member, are readily identifiable. The Defendants have records of each account that it collected on when it did not hold a license.

109.     Plaintiff will fairly and adequately protect the interests of the Class and Subclass and has retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class Counsel have investigated and identified potential claims in the action; have a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

110.     The prosecution of separate actions by individual members of the Class and Subclass would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action or the prosecution of separate actions by individual members of the class would create the risk that adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their

interests.  Prosecution as a class action will eliminate the possibility of repetitious litigation.

111.    Plaintiff does not anticipate any difficulty in the management of this litigation. The
Defendants' actions are uniform in their approach to all class members and done pursuant to written
policies and procedures.

### 6.    FIRST COUNT
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF FOR THE
### PLAINTIFF CLASS AGAINST THE DEFENDANTS

112.    Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

113.    Section 3 of the CFLA, codified at N.J.S.A. 17:11C-3, provides that "[n]o person
shall engage in business as a consumer lender or sales finance company without first obtaining a
license or licenses under this act."

114.    A violation of section 3 in the making or collection of a loan voids the loan and
precludes any further right to collect or receive any principal, interest or charges, pursuant to the
CFLA, at N.J.S.A. 17:11C-33(b).

115.    Thus, if the Defendant NCT Trusts acquired any loans, the Defendant NCT Trusts
lacked the legal right to acquire and collect the debts when they did not hold a license required by
New Jersey Law.

116.    Any judgment arising from an action illegally filed by Defendant NCT Trusts should
be held to be unenforceable.

117.    The existence of the judgments are public records that have and will continue to
adversely affect the Class.

118.    The Defendant NCT Trusts violated section 3 of the CFLA by making false or
misleading communications that they had acquired the loans of Plaintiff and the Plaintiff Class when
the Defendant NCT Trusts knew they could not prove they acquired any particular loans.

119.   The Defendant NCT Trusts violated section 3 of the CFLA by engaging in the "consumer loan business" in New Jersey without a license to do so.

120.   The Defendant NCT Trusts violated section 3 of the CFLA by engaging in business as a "sales finance company" without a license to do so.

121.   The Defendant NCT Trusts' violations of the CFLA constitute unconscionable commercial practices and otherwise violate the Consumer Fraud Act at N.J.S.A. 56:8-2.

122.   The unconscionable commercial practices included Defendant NCT Trusts failing to disclose material facts to Plaintiff and the Plaintiff Class Members—they could not prove they were an assignee of any specific loan.

123.   The unconscionable commercial practices also included Defendant NCT Trusts using TSI as a student loan servicer when it is not licensed to do so.

124.   Plaintiff and the Plaintiff Class suffered ascertainable loss from Defendant NCT Trusts' CFA violations in the amount monies collected, and/or paid on the void accounts or for payments collected by an unlicensed student loan servicer when it was required to be licensed.

125.   Plaintiff therefore has standing to seek injunctive and other equitable relief under the CFA, at N.J.S.A. 56:8-19.

126.   Moreover, under the Uniform Declaratory Judgments Law at N.J.S.A. 2A:16-53, the Plaintiff and the putative Class members are "person[s] interested under a . . . written contract" and person[s] "whose rights, status or other legal relations are affected by a statute" and therefore, they "may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status or other legal relations thereunder."

127.   The Plaintiff and the Plaintiff Class are entitled to a declaratory judgment that the accounts Defendant NCT Trusts allegedly took assignment would be void if true.

128.     The Plaintiff and the Plaintiff Class are entitled to a declaratory judgment that the Defendant NCT Trusts cannot prove they are an assignee or have any right to collect any specific loans of the Plaintiff or of the members of the Plaintiff Class.

129.     The Plaintiff and the Plaintiff Class are entitled to a declaratory judgment that any judgments obtained in the name of Defendant NCT Trusts are unenforceable.

130.     The Plaintiff and the Plaintiff Class are entitled to a declaratory judgment that the Defendant NCT Trusts engaging TSI to service any student loan is unlawful.

131.     The Plaintiff and the Plaintiff Class are entitled to a declaratory judgment that TSI is unlawfully acting as a student loan servicer and should be enjoined from continuing to act as a student loan servicer.

132.     The Defendant, TSI, in addition to the relief being granted in the preceding paragraph, along with Defendants, U.S. Bank and Wilmington, should also be enjoined from further collection efforts in the name of the NCT Trusts because the Defendant NCT Trusts have no employees but act through these Defendants and others.  The wrongful actions and omissions were done by, directly or indirectly, by these Defendants or may be done by these Defendants, directly and indirectly.

133.     The Defendant NCT Trusts, and all of its agents or others acting on their behalf or in their name should be enjoined from any further action or failing to take actions that result in any effort to collect any accounts, retain benefits from collecting on any account or enforce judgments should be enjoined.

**WHEREFORE**, as to Count One, Plaintiff, on behalf of himself and the putative plaintiff class members, hereby request a Judgment against Defendant NCT Trusts, TSI, U.S. Bank and Wilmington, jointly and severally,

a.     Granting class certification for class-wide equitable relief under R. 4:32-1(b)(2), and issuing a declaratory judgment applicable to the Plaintiff and putative Class and Subclass, pursuant to the Uniform Declaratory Judgments Law at N.J.S.A. 2A:16-53 and against the Defendant NCT Trusts, TSI, U.S. Bank and Wilmington, ruling that:

1.     The Defendant NCT Trusts, TSI, U.S. Bank and Wilmington violated section 3 of the CFLA by making false or misleading communications that Defendant NCT Trusts had acquired the loans of the Plaintiff and Class Members.

2.     The Defendant NCT Trusts violated section 3 of the CFLA by engaging in the "consumer loan business" in New Jersey without a license to do so;

3.     Alternatively, or additionally, the Defendant NCT Trusts violated section 3 of the CFLA by engaging in business as a "sales finance company" without a license to do so;

4.     The Defendant NCT Trusts, U.S. Bank, Wilmington and TSI violated section 3 of the CFLA by engaging in or permitting TSI to act as a student loan servicer without a license to do so;

5.     The Plaintiff's and putative class members' accounts of which Defendant NCT Trusts allegedly took assignment and/or enforced are void by operation of N.J.S.A. 17:11C-33(b);

6.     The void accounts cannot be revived through reassignment;

7.     The judgments obtained by Defendant NCT Trust in actions based on an account allegedly acquired by Defendant NCT Trusts when it was not properly licensed are unenforceable;

8.     At all relevant times hereto Defendant NCT Trusts did not have, and has never had, the legal capacity to collect or receive any principal, interest or charges under the void accounts, through any collection mechanism or legal right;

9.     Defendant NCT Trusts lacked the capacity to seek enforcement of any of the Plaintiff's or putative class members' accounts or any judgments obtained on such accounts for the above reasons.

10.    Defendant NCT Trusts, U.S. Bank and Wilmington lacked the capacity to appoint an unlicensed entity, TSI, to service the student loans of the Plaintiff or the Plaintiff Class members and any actions based on the actions of the unlicensed student loan servicer, TSI are void.

b.     Granting a permanent injunction against the Defendant NCT Trusts, TSI, U.S. Bank and Wilmington pursuant to the CFA, at N.J.S.A. 56:8-19, prohibiting them from making any further attempts to enforce New Jersey consumers' accounts, including an injunction against any attempt to collect upon, enforce or assign the account contracts, or to seek collection remedies on or assign any outstanding judgments entered in collection actions on the accounts;

c.     Granting a permanent injunction against the Defendant NCT Trusts, TSI, U.S. Bank and Wilmington pursuant to the CFA, at N.J.S.A. 56:8-19, prohibiting them from making any further attempts to have any student loans serviced by TSI ;

d.     Directing the Defendant NCT Trusts, TSI, U.S. Bank and Wilmington to provide equitable notice relief pursuant to the CFA, providing for notice to Class members of the declaratory and injunctive ruling.

e.     Awarding Plaintiff's counsel reasonable attorneys' fees and costs under the CFA;

f.      For such other and further relief as the Court deems equitable and just.

### 7.      SECOND COUNT
**DAMAGES UNDER THE CONSUMER FRAUD ACT ON BEHALF OF PLAINTIFF AND THE SUBCLASS**

134.    Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

135.    Defendants are "persons" within the meaning of the CFA at N.J.S.A. 56:8-1.

136.    Plaintiff and those similarly situated purchased "merchandise" within the meaning of the CFA at *N.J.S.A.* 56:8-1.

137.    Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in connection with the sale of merchandise in violation of the CFA at N.J.S.A. 56:8-2.

138.    Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in the subsequent performance of the sale of merchandise in violation of the CFA at N.J.S.A. 56:8-2.

139.    Defendants committed unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in direct violation of the CFA at N.J.S.A. 56:8-2 by:

    A.      Making false or misleading communications that it had acquired the loans of Plaintiff and the Class when Defendants knew they could not prove the Defendant NCT Trusts had acquired any particular loans.

    B.      Misrepresenting in its collection and other communications that Defendant NCT Trusts had the legal right to collect on the account when it lacked the proper license to do so even if it had acquired the account;

    C.      Filing civil collection complaints when it lacked the proper license to do so;

    D.      Representing, explicitly or impliedly, in the collection complaints and related

communications concerning or with Plaintiff and the Class Members that
Defendant NCT Trusts were properly licensed giving it the right to collect and
file the actions such that the collection complaints could be properly filed and
maintained;

E.     Representing, explicitly or impliedly, in the collection complaints and related
communications concerning or with Plaintiff and the Class Members that TSI
was properly licensed; and

F.     Demanding and accepting payments from Plaintiff and the Class Members on
the accounts or the judgments obtained from actions filed when the Defendant
NCT Trusts and TSI lacked the proper licenses to or lacked the ability to
prove that the Defendant NCT Trusts had been assigned the legal right to
enforce the accounts;

G.     Demanding and accepting payments from Plaintiff and the Class Members
through a servicer, TSI, when it was required to be licensed but was not
licensed as a student loan servicer.

140.     As a result of Defendants' unlawful actions, Plaintiff and the Subclass members
suffered ascertainable loss from Defendants' CFA violations in the amount monies claimed to be
due, collected, and/or paid on the void accounts, entitling them to treble damages under the CFA, at
N.J.S.A. 56:8-19.

**WHEREFORE**, as to Count Two, Plaintiff, on behalf of himself and the putative Subclass
members, hereby request a Judgment against Defendants, jointly and severally,

a.     Granting class certification of the Subclass under R. 4:32-1(b)(3);

b.     Awarding treble damages under the CFA, at N.J.S.A. 56:8-19;

c.   Alternatively awarding a refund of all moneys collected under the CFA, at N.J.S.A. 56:8-2.11;

d.   Awarding Plaintiff's counsel reasonable attorneys' fees and costs under the CFA, at N.J.S.A. 56:8-19;

e.   For pre-judgment and post-judgment interest; and

f.   For such other and further relief as the Court deems equitable and just.

## 8.   THIRD COUNT
### UNJUST ENRICHMENT
#### DISGORGEMENT ON BEHALF OF PLAINTIFF AND THE SUBCLASS

141.   Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

142.   The Defendants have been unjustly enriched by the funds that they have received from the Plaintiff and Subclass.

143.   The collection of those funds by Defendants have conferred a benefit on the Defendants.

144.   The Defendants know that that they received a benefit by receiving funds from the Plaintiff and Subclass members.

145.   Defendants' retention of the benefits conferred on them by the Plaintiff and Subclass based on obtained accounts or judgments thereon for which it lacked the ability to prove it had any legal right to enforce the accounts would be unjust.

146.   Defendants' retention of the benefits conferred on them by the Plaintiff and Subclass based on obtained accounts serviced by an unlicensed servicer would be unjust.

147.   Defendants' retention of the benefits conferred on them by the Plaintiff and Subclass based on illegally obtained accounts and judgments would be unjust.

148.   Defendants should be ordered to disgorge or provide restitution to the Plaintiff and

the Subclass.

149.    The disgorgement or restitution should include any profits or other benefits enjoyed by the Defendants as a result of the receipt of the Plaintiff and Subclass's funds.

**WHEREFORE**, as to Count Three, Plaintiff, on behalf of himself and the putative subclass members, hereby request a Judgment against Defendants, jointly and severally,

    a.  Granting class certification of the Subclass under R. 4:32-1(b)(3);

    b.  A money judgment for restitution or disgorgement of all amounts collected by the Defendants from the Plaintiff and Subclass including any profits or other benefit enjoyed by Defendants as a result of receiving and using the funds from them;

    c.  For attorney's fees, litigation expenses and costs in connection with this action;

    d.  For pre-judgment and post-judgment interest; and

    e.  For such other and further relief as the Court deems equitable and just.

### 9.    JURY DEMAND

Plaintiff demands a trial by jury on all issues subject to trial by jury.

### 10.    NOTICE TO ATTORNEY GENERAL

A copy of this Complaint will be mailed to the Attorney General of the State of New Jersey within ten days after the filing with the Court, pursuant to N.J.S.A. 56:8-20.

### 11.    DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Yongmoon Kim is designated as trial counsel for Plaintiff.

### 12.    CERTIFICATION

Pursuant to Rule 4:5-1, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any action pending in any court or the subject of a pending

arbitration proceeding, nor is any other action or arbitration proceeding contemplated. I further certify that I know of no party who should be joined in this action at this time.

I hereby certify that pursuant to Rule 1:38-7: All confidential identifiers of the parties to this action have been redacted from all documents or pleadings submitted to the Court.

Dated: April 21, 2022                              KIM LAW FIRM LLC

                                                   */s/ Yongmoon Kim*
                                                   Yongmoon Kim
                                                   *Attorneys for Plaintiff*

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, DC 20549

## Form 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended: June 30, 2007

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number:  001-31825

# THE FIRST MARBLEHEAD CORPORATION

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **04-3295311** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **The Prudential Tower 800 Boylston Street, 34th Floor Boston, Massachusetts** | **02199-8157** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code:  **(617) 638-2000**

Securities registered pursuant to Section 12(b) of the Act:

| | |
|---|---|
| **Common Stock, $.01 par value** | **New York Stock Exchange** |
| (Title of each class) | (Name of each exchange on which registered) |

Securities registered pursuant to Section 12(g) of the Act:  **None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant:  (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act (Check one):

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the registrant (without admitting that any person whose shares are not included in the calculation is an affiliate) was approximately $3,171,000,000 based on the last reported sale price of the common stock on the New York Stock Exchange on December 30, 2006.

Number of shares of the registrant's class of common stock outstanding as of July 31, 2007: 93,405,267

### DOCUMENTS INCORPORATED BY REFERENCE

The registrant intends to file a proxy statement pursuant to Regulation 14A within 120 days of the end of the fiscal year ended June 30, 2007. Pursuant to Paragraph G(3) of the General Instructions to Form 10-K, information required by items 10, 11, 12, 13 and 14 of Part III have been omitted from this report (except for information required with respect to our executive officers and code of ethics, which is set forth under "Executive Officers" and "Code of Ethics" in Part I of this report) and are incorporated by reference to the definitive proxy statement to be filed with the Securities and Exchange Commission.

# [EXHIBIT A]

- third parties that are not themselves lenders but which market loans on behalf of the lenders that fund the loans. We refer to these third parties as loan marketers, and we refer to the lenders that fund these loans as program lenders; and

- "school channel," which are programs marketed directly to educational institutions by:

  - lenders; and

  - education loan marketers on behalf of program lenders.

Although we offer our clients a fully integrated suite of outsourcing services, we do not charge separate fees for many of these services. Moreover, although we receive fees for providing loan processing services to The Education Resources Institute, Inc., or TERI, in connection with TERI-guaranteed loans, and fees from certain of our clients for marketing coordination services, these fees represent reimbursement of the direct expenses we incur. Accordingly, we do not earn a profit on these fees. Although we provide these various services without charging a separate fee, or at cost in the case of processing TERI-guaranteed loans and marketing coordination services, we generally enter into agreements with the private label lenders giving us the exclusive right to securitize the loans that they do not intend to hold, and we receive structural advisory fees and residuals for facilitating securitizations of these loans. Our level of profitability depends on our ability to earn structural advisory fees and residuals from facilitating securitizations of private label loans. We may in the future enter into arrangements with private label lenders under which we provide outsourcing services but do not have the exclusive right to securitize the loans that they originate. We also receive fees as the administrator of the trusts that have purchased the private label loans, and in this capacity monitor the performance of the loan servicers. See "Management's Discussion and Analysis of Financial Condition and Results of Operations."

The primary driver of our results of operations and financial condition is the volume of loans for which we provide outsourcing services from loan origination through securitization. The volume of loans for which we structured securitizations increased to approximately $3.8 billion in fiscal 2007 from approximately $2.8 billion in fiscal 2006 and approximately $2.3 billion in fiscal 2005.

### *Program Design and Marketing Coordination*

We help our clients design their private loan programs. Our loan program design approach begins with a standard set of pricing options, legal agreements and third-party relationships that we can then customize for our clients in order to satisfy their particular needs. In addition, we assist certain clients with the design and execution of their marketing programs.

#### *Program Design*

We have developed strong relationships with lenders and other organizations through active marketing by our field sales force and business development executives. Our private label clients are typically lenders or educational loan marketers that desire to supplement their existing federal loan or other consumer lending programs with a private loan offering. Increasingly, these lenders or marketers are responding to competitive pressures to offer private loan programs. They are attracted to an opportunity to extend their existing brand in the federal loan or consumer lending marketplace to the private student loan marketplace.

Beyond federal student loan lenders, our approach is flexible enough to facilitate private student loan programs for a range of clients, who, in turn, serve a variety of consumers. We believe a private label opportunity exists with any business, union, affinity group or other organization that has employees, customers, members or other constituencies who are concerned about education costs. We can assist such organizations in partnering with a lender and in designing a program that provides tangible benefits to their constituencies, while simultaneously generating additional revenue. Regardless of whether the client

5



is a commercial bank, marketing company, affinity organization or a large corporation, we can contribute our specialized knowledge, experience and capabilities to assist these entities in the development of a private loan program to meet their needs, while minimizing their resource commitment and exposure to credit risk.

One of the key components of our private label programs is the opportunity for our lender clients to mitigate their credit risk through a loan repayment guarantee by TERI. TERI guarantees repayment of the borrowers' loan principal, together with capitalized and/or accrued interest on defaulted loans. For additional information on TERI, see "—Relationship with The Education Resources Institute." If the lender disposes of the loan in a securitization, this guarantee remains in place and serves to enhance the terms on which asset-backed securities are offered to investors.

Private label clients fall into two categories:

- *Make and sell.* In this category, lenders select credit criteria and loan terms tailored to meet their needs and then outsource to us all operating aspects of loan origination and customer support, and typically hold the loans on their balance sheets for some limited period of time. Lenders that wish to have their loans guaranteed by TERI are required to meet TERI's underwriting criteria. In the case of clients that do not desire, or do not have the ability, to fund the loans initially, we arrange for them to work with a program lender in marketing their programs to customers. In both cases, after the holding period, we will facilitate a securitization to enable lenders to dispose of the loans, from which we generate structural advisory fees and residuals. See "—Securitization."

- *Make and hold.* In this category, clients outsource all operating aspects of loan origination and customer support, but finance the loans on their balance sheets and generally continue to hold the loans through the scheduled repayment, prepayment or default. Clients retain the ability to securitize the loans through us, even if they elect not to do so initially. Unless clients securitize their make and hold loans through us, the revenues we generate on these loans are limited to the processing fees that we receive from TERI, which represent reimbursement of the direct expenses we incur in originating the loans.

The following table presents information regarding the aggregate principal and accrued interest balance of private label loans that we processed during the fiscal years ended June 30, 2007, 2006 and 2005:

|  | Fiscal year ended June 30, | | |
| --- | --- | --- | --- |
|  | 2007 | 2006 | 2005 |
|  | (dollars in billions) | | |
| Approximate "make and sell" volume processed.............. | $3.8 | $2.8 | $2.1 |
| Approximate "make and hold" volume processed............. | 0.4 | 0.4 | 0.5 |
| Approximate total volume processed........................ | $4.2 | $3.2 | $2.6 |

*Marketing Coordination*

We provide marketing coordination services intended to enable our lender and loan marketer clients to increase loan volume and resulting program revenue. We have established an in-house department that works in collaboration with clients, third-party agencies and vendors to support the development, execution and analysis of direct response marketing programs, including direct mail, direct response television, and Internet-based marketing campaigns. These programs are designed to drive direct-to-consumer loan program volume and generate learnings that inform ongoing marketing optimization and refinement.

6



# [EXHIBIT A]

Sunshine Act already passed by the U.S. House of Representatives would impose significant additional disclosure and processing burdens on our loan origination operations. Other proposals, which have not yet passed in either house of Congress, would reduce protection of the loans we securitize in bankruptcy proceedings.

Violations of the laws or regulations governing our operations, or the operations of TERI or our other clients, could result in the imposition of civil or criminal penalties, the cancellation of our contracts to provide services or our exclusion from participating in education loan programs. These penalties or exclusions, were they to occur, would negatively impair our ability to operate our business. In addition, the loan assets held by securitization trusts that we have structured could be adversely impacted by violation of tax or consumer protection laws. In such event, the value of our residual interests could also be adversely impacted. In some cases, such violations may render the loan assets unenforceable.

***Recent litigation has sought to re-characterize certain loan marketers and other originators as lenders; if litigation on similar theories were successful against us or any third-party marketer, the loans that we securitize would be subject to individual state consumer protection laws.***

We provide financial and educational institutions, as well as other organizations, with an integrated suite of services in support of private student loan programs. All of the lenders with which we work are federally-insured banks and credit unions and, therefore, are not subject to many state consumer protection laws, including limitations on certain interest rates, fees and other charges. In providing our private student loan services to our clients, we do not act as a lender, guarantor or loan servicer, and the terms of the loans that we securitize are regulated in accordance with the laws and regulations applicable to the lenders.

The association between high-interest "payday loans" marketers and out-of-state national banks has come under recent scrutiny. Recent litigation asserts that payday loan marketers use out-of-state lenders in order to evade the usury and interest rate caps, and other consumer protection laws, imposed by the states where they do business. Such litigation has sought, successfully in some instances, to re-characterize the loan marketer as the lender for purposes of state consumer protection law restrictions. Similar civil actions have been brought in the context of gift cards. We believe that our activities, and the activities of third parties whose marketing on behalf of lenders is coordinated by us, are distinguishable from the activities involved in these cases.

Additional state consumer protection laws would be applicable to the loans we facilitate if we, or any third-party loan marketer whose activities we coordinate, were re-characterized as a lender, and the loans (or the provisions governing interest rates, fees and other charges) could be unenforceable. In addition, we could be subject to claims by consumers, as well as enforcement actions by regulators. Even if we were not required to cease doing business with residents of certain states or to change our business practices to comply with applicable laws and regulations, we could be required to register or obtain licenses or regulatory approvals that could impose a substantial cost on us. To date, there have been no actions taken or threatened against us on the theory that we have engaged in unauthorized lending. However, such actions could have a material adverse effect on our business.

***The price of our common stock may be volatile.***

The trading price of our common stock may fluctuate substantially, depending on many factors, some of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose part or all of your investment in our shares of common stock. Those factors that could cause fluctuations include, but are not limited to, the following:

- actual or anticipated changes in our earnings or fluctuations in our operating results or in the expectations of securities analysts;

33



HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 1 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 42 of 107 PageID: 189

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 24 of 41

## TRANSITION SERVICES AGREEMENT

This Transition Services Agreement is dated as of May 30, 2008 (the "Agreement") between The Education Resources Institute, Inc., a Massachusetts non-profit corporation ("TERI"), The First Marblehead Corporation, a Delaware corporation ("FMC") and First Marblehead Education Resources, Inc. ("FMER"; together with FMC, the "FMC Entities").

WHEREAS, TERI and FMC, FMER and/or TERI Marketing Services, Inc. ("TMSI") are parties to several agreements, including (i) the Master Loan Guaranty Agreement dated as of February 2, 2001 (the "Guaranty Agreement"); (ii) the Master Servicing Agreement dated as of July 1, 2002 (the "MSA"); (iii) the Database Sale and Supplementation Agreement dated as of June 20, 2001 (the "Database Agreement"); (iv) the Marketing Services Agreement dated as of July 1, 2001 (the "Marketing Agreement" and together with the Guaranty Agreement, MSA, and Database Agreement, the "FMC Agreements");

WHEREAS, on April 7, 2008 (the "Petition Date"), TERI filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court");

WHEREAS, TERI has informed FMC that it seeks to reject, pursuant to Section 365 of the Bankruptcy Code, the FMC Agreements and that TERI will request that the effective date of such rejection will be May 31, 2008, 11:59 p.m. (Eastern Time) and that this Agreement become effective as of June 1, 2008, 12:01 a.m. (Eastern Time) (the "Effective Date");

WHEREAS, upon the terms and subject to the conditions set forth herein, each of the parties hereto has agreed to provide or cause to be provided (in such capacity, the "Provider") to the other party (in such capacity, the "Recipient") certain transitional services on the terms set forth in this Agreement and the appendices hereto ("Appendices" and each an "Appendix");

WHEREAS, the parties seek for this Agreement to govern the provision of certain Services (defined below) for the term of this Agreement beginning on the Effective Date and agree that the parties shall cooperate with one another to have the Motion seeking rejection of the FMC Agreements and approval of this Agreement approved by the Bankruptcy Court as soon as practicable;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I

### SERVICES PROVIDED

1.1   Services.  Upon the terms and subject to the conditions set forth in this Agreement (including the Appendices hereto), Provider will provide or cause to be provided each of the services (collectively, the "Services") described in the Appendices hereto (each of which Appendix sets forth, among other things:  (i) a description of the Services to be rendered, the provider of such Services and the recipient of such Services; (ii) the period during which such

# [EXHIBIT B]

Services will be provided (the "Time Period"); (iii) the cost or charges for providing such Services and the arrangements for payment thereof; (iv) the procedures necessary to cancel such Services; and (v) the person to whom notices and communications regarding such Services should be given).

1.2    Level of Services.  Provider shall generally provide the Services in substantially the same manner and of the same quality and standards as it generally performs comparable services consistent with past practices but shall not be obligated in connection with its performance of the Services to:  (i) hire any additional employees, consultants or independent contractors; (ii) maintain the employment of any specific current employees, consultants or independent contractors; (iii) maintain any specific level of staffing; or (iv) purchase, lease, or license any additional equipment, software, facility or other asset or property.  The Services shall be further subject to the terms and conditions of any agreements between Provider and any third party, as well as any terms and conditions set forth in the Appendices.

1.3    Reimbursement for Services.  In full compensation for the Services, Recipient shall pay Provider the charges and costs for providing  Services (determined in accordance with the applicable Appendix) within fifteen (15) days after receipt of Provider's monthly invoice therefor unless payment is required more often or in advance pursuant to any such Appendix. The Recipient shall not be required to pay for any meetings with management, other assistance or consultation provided by any employees or consultants of the Provider during the terms of this Agreement unless the applicable Appendix specifically identifies and/or charges for the costs of such services.  All payments will be made in U.S. dollars.  Each invoice shall set forth in reasonable detail the calculation of the charges and costs upon which the amount to be reimbursed is based, broken down by the Services rendered during the period to which such invoice relates.

1.4    Conditions Precedent.  Notwithstanding anything herein to the contrary, the effectiveness of this Agreement is subject to the satisfaction of the following conditions precedent:

(a)  TERI shall have paid to FMER all amounts due under the MSA through May 31, 2008 on or before June 23, 2008;

(b)  TERI will have obtained from the Bankruptcy Court no later than three (3) business days following the hearing date set by the Bankruptcy Court, and in no event later than June 30, 2008, a final order in a form and substance reasonably acceptable to FMC (i) acknowledging the first priority security interests of the Trusts (defined below) in the pledged accounts (including all assets and funds in such accounts) established for such Trusts pursuant to the various guaranty agreements and deposit and security agreements by TERI in favor of such Trusts, and (ii) authorizing and directing TERI to honor its obligations under such guaranty agreements and deposit and security agreements to purchase defaulted loans using cash collateral in the pledged accounts established for the benefit of the following securitization trusts (collectively, the "Trusts"):  The National Collegiate Trust-2001-CP1; The National Collegiate Student Loan Trust 2001 AR 1, 2, 3; The National Collegiate Trust 2002-CP1; The National Collegiate Student Loan Trust 2003-1; The National Collegiate Student Loan Trust 2004-1; The National Collegiate Student Loan Trust 2004-2; The National Collegiate Student Loan Trust 2005-1; The National Collegiate Student Loan Trust 2005-2; The National Collegiate Student Loan

# [EXHIBIT B]

HUD-L -001598-21  04/21/2022 10:09:52 PM  Pg 3 of 18  Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 44 of 107 PageID: 191

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 26 of 41
Transition Services Agreement – Page 3

Trust 2005-3; The National Collegiate Student Loan Trust 2006-1; The National Collegiate Student Loan Trust 2006-2; The National Collegiate Student Loan Trust 2006-3; The National Collegiate Student Loan Trust 2006-4; The National Collegiate Student Loan Trust 2007-1; The National Collegiate Student Loan Trust 2007-2; The National Collegiate Student Loan Trust 2007-3; and The National Collegiate Student Loan Trust 2007-4;

(c) The Bankruptcy Court shall have entered a final order in form and substance reasonably acceptable to FMC approving this Agreement, by June 30, 2008.

1.5    Term. Subject to the terms hereof, this Agreement shall become effective as of the Effective Date and shall terminate on July 31, 2008 (or such later date specified in any Appendix), provided, however, that TERI shall have the right to extend this Agreement (a) for one additional 30 day period provided that it gives written notice of such election to extend in accordance with the provisions of Section 3.1 hereof no later than July 15, 2008 and (b) for a second 30 day period subject to the consent of FMC (not to be unreasonably withheld) provided that TERI gives written notice of such election to extend in accordance with the provisions of Section 3.1 hereof no later than August 12, 2008. Notwithstanding the foregoing or any contrary language in this Agreement or any Appendix, TERI may, upon ten (10) business days notice to FMC, cancel and terminate any specific Service or all of the Services specified in any Appendix hereto with no effect on any other Service or Appendix. FMC may, upon three (3) business days notice to TERI, terminate this Agreement or any Specific Service in the event of breach by TERI of Section 1.3 of this Agreement if such breach is not cured within three (3) business of receipt of such notice.  TERI shall not be excused from paying any monies due to or earned by Provider prior to the effective date of termination.

ARTICLE II

DATA TRANSFER

2.1 The FMC Entities agree, at TERI's sole cost determined according to Appendix D, and subject to the conditions set forth herein, to provide TERI with the data comprising the Loan Database (as defined in the Database Agreement) to the extent such data is or has been received by TERI solely in connection with its business as a loan guarantor and is stored, maintained or held by FMER and is data owned by TERI and a copy of the data identified on Appendix E hereto, certain of which data may be included in, and shall constitute a part of, the Loan Database. FMER will provide such data as soon as practicable but in any event on or before July 31, 2008.  FMC and/or FMER will deliver the data in machine readable form where appropriate, otherwise in printed form.  TERI shall be responsible for any and all data transformation and transport within the TERI infrastructure to make the data usable for TERI's purposes.  TERI shall not be entitled to any software, application or other system owned or developed by or licensed by the FMC Entities, or any proprietary information of FMC.

Notwithstanding the rejection or other termination of the Database Agreement, (i) FMER shall continue to possess all right, title and interest in and to the Delivered Database (as defined in the Database Agreement), including the right to use and possess the Delivered Database and the right to share the data with FMC, to disclose the data to others, to copy and manipulate the data and generally to exercise ownership of the Delivered Database and all modifications and

3

# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 4 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 45 of 107 PageID: 192

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 27 of 41
Transition Services Agreement – Page 4

enhancements thereof and (ii) the Loan Database transferred from FMER to TERI pursuant to Section 2.1 of this Agreement shall remain subject to sections 2.01 (Grant), 2.02 (FMER Restrictions) and 2.03 (TERI Restrictions) of such Database Agreement and any and all additional terms of the Database Agreement that pursuant to section 10.01 of the Database Agreement survive termination of such agreement and remain in full force and effect.

Subject to section 3.11, TERI hereby acknowledges and agrees that the FMC Entities have paid all amounts due under the Database Agreement as of the date hereof and that no fees shall be due after the date hereof for any Updates or Queries (each as defined in the Database Agreement), and TERI is no longer obligated to furnish any.

     2.2  To the extent not prohibited by applicable law, regulation, rule or contract-, and notwithstanding the definition of Excluded Data under the Database Agreement, TERI hereby grants to FMC and FMER-a non-exclusive, fully paid and perpetual right and license to use the following data solely for "fraud prevention purposes" data in the case management systems, the last 13 months of the "ALE" data and data in the internal fraud table from the Capstone system (the "Fraud Data").  TERI will use reasonable efforts to (a) cooperate with any requests by FMER to third parties for consent to the use of the Fraud Data and (b) to otherwise facilitate the use of the Fraud Data by FMER.

ARTICLE III

MISCELLANEOUS

     3.1.  <u>Notices and Communications</u>.  All notices and communications provided for herein shall be deemed to have been duly given if delivered to the persons noted in the applicable Appendix or by notification via electronic mail or overnight delivery, to Willis J. Hulings, President and Chief Executive Officer (hulings@teri.org) and Amy W. Bizar, General Counsel (bizar@teri.org) of TERI, Park Square Building, 31 St. James Avenue, 4th Floor, Boston, MA 02116 and Jack L. Kopinsky, President, Chief Executive Officer and Chief Operating Officer (jkopnisky@firstmarblehead.com) and Peter B. Tarr, Chairman and General Counsel (ptarr@firstmarblehead.com) of FMC, Prudential Tower, 800 Boylston Street, 34th Floor, Boston, MA 02199.

     3.2.  <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, including any trustee appointed in TERI's chapter 11 or in any chapter 7 proceeding; provided that neither TERI nor FMC may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the consent of the other; and provided further that no permitted transfer or assignment will relieve the transferring or assigning party of its obligations under this Agreement.

     3.3.  <u>No Third Party Rights</u>.  Nothing contained in this Agreement is intended to confer any rights or benefits on any Person other than the parties hereto.

4

# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 5 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 46 of 107 PageID: 193

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 28 of 41

Transition Services Agreement – Page 5

3.4.  <u>Governing Law and Jurisdiction</u>.  This Agreement shall be construed in accordance with and governed by the law of the Commonwealth of Massachusetts, without giving effect to the conflicts of law rules of such state.

3.5.  <u>Force Majeure</u>.  Neither party shall be liable to the other party for its failure or delay in performing its obligations hereunder (other than its obligation to pay money) due to any contingency beyond such party's control including, without limitation, acts of God, fires, floods, wars, acts of war, sabotage, terrorism, accidents, labor disputes (whether or not such disputes are within the power of the party to settle), shortages, governmental laws, ordinances, rules or regulations (whether valid or invalid), inability to obtain power, materials, equipment or transportation and any other similar contingency (each a "<u>Force Majeure Event</u>").

3.6.  <u>Headings</u>.  The descriptive headings used in this Agreement are inserted for convenience of reference only and shall in no way be construed to define, limit, describe, explain, modify, amplify, or add to the interpretation, construction or meaning of any provision of, or scope or intent of, this Agreement nor in any way affect this Agreement.

3.7.  <u>Indemnity</u>.  TERI and FMC respectively will indemnify, defend and hold each other harmless from and against any and all claims, demands or suits (by any person or entity), losses, liabilities, damages (but excluding any consequential, special, indirect, punitive or incidental damages), obligations, payments, costs and expenses (including, without limitation, the costs and expenses of any and all actions, suits, proceedings, assessments, judgments, settlements and compromises relating thereto and reasonable attorneys' fees and reasonable disbursements in connection therewith) to the extent the foregoing are not covered by insurance (each, an "Indemnifiable Loss"), asserted against (a) TERI or (b) FMER and/or FMC by an unrelated third party relating to, resulting from or arising out of any breach by TERI or FMER and/or FMC, respectively, of this Agreement; provided, however, that the indemnity provided to TERI by FMC shall not exceed in scope the indemnity provided under the MSA.

3.8.  <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or any other jurisdiction, and this Agreement shall be reformed, construed and enforced in such jurisdiction so as to best give effect to the intent of the parties under this Agreement.

3.9.  <u>Counterparts</u>.  This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto were upon one and the same instrument.

3.10.  <u>Amendments; No Waivers</u>.

(a) Any provision of this Agreement may be amended or waived (including any term set forth in any Appendix hereto) if, and only if, such amendment or waiver is in

LIBC/3315992.1

# [EXHIBIT B]

writing and signed, in the case of an amendment, by TERI and FMC, or in the case of a waiver, by the party against whom the waiver is to be effective.

(b)      No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.

3.11   Reservation of Rights.  Notwithstanding anything herein to the contrary, nothing herein shall limit or otherwise affect any claims, rights or remedies of FMC, FMER, TMSI, or any of their affiliates that such entities may have against TERI or any of its affiliates, including without limitation all claims, rights or remedies arising from or in connection with the rejection of the FMC Contracts, all of which claims, rights and remedies are preserved.  TERI reserves any claims, rights or remedies that it may have against the FMC entities, including without limitation, its rights in respect of the balance of the Database Note, as defined in the Database Agreement, of approximately $3,168,000.

3.12   Non-Solicitation.  During the term of this Agreement and for a period of six (6) months thereafter, neither party shall hire or solicit the employment of a then-actively employed employee of the other who has participated in the provision of services hereunder (an "Engaged Party").  This prohibition shall not apply if such employment results from a general circulation advertisement.  If either party hires an Engaged Party in violation of the foregoing restriction, such party shall pay to the other party as liquidated damages an amount equal to three hundred and fifty (350) times the party's standard hourly billing rate (or hourly wage rate) for the Engaged Party, which amount is intended to compensate the party for its loss, including all costs and expenses that may be incurred by the party in replacing such employee.  Each party agrees and acknowledges that the restrictions and amounts of damages set forth in this Section are reasonable and necessary in order to protect the party's legitimate business interests.

3.13   Survival.  Article II shall survive termination of this agreement.

LIBC/3315992.1

# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 7 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 48 of 107 PageID: 195

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 30 of 41

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed the day and year first above written.

**THE EDUCATION RESOURCES INSTITUTE, INC.**

By: s/William G. Davidson, Jr.
Name:  William G. Davidson, Jr.
Title:  Senior Vice President and CFO


**THE FIRST MARBLEHEAD CORPORATION**

By: s/Kenneth Klipper
Name: Kenneth Klipper
Title: Senior Vice President


**FIRST MARBLEHEAD EDUCATION
RESOURCES, INC.**

By: s/Kenneth Klipper
Name: Kenneth Klipper
Title:  Senior Vice President

LIBC/3315992.1

# [EXHIBIT B]

<u>Appendix A</u>

PIPELINE LOANS

<u>DESCRIPTION</u>:    Any and all services related to the collection, evaluation, administration, approval or denial, processing and funding of student loans pursuant to which an application was received pursuant to any existing loan program on or before the later of (i) the termination of this Agreement pursuant to Section 1.5 and (ii) the date that is 60 days after all lenders suspend or terminate loan programs with TERI ("Pipeline Loans").  To the extent that any such services are provided after the termination of this Agreement, TERI will pay for those services on the same terms as if the Agreement remained in effect.

<u>PROVIDER</u>:    FMER

<u>TIME PERIOD</u>:    The earlier of (i) the termination of this Agreement pursuant to Section 1.5 and (ii) the date that is 60 days after all lenders suspend or terminate loan programs with TERI.

<u>COST</u>:    FMER will charge TERI a fee equal to the amount of the Origination Fee that the lender is obligated to pay TERI pursuant to its existing agreement with TERI.

<u>CONTACT</u>:    Anne P. Bowen

2

LIBC/3315992.1



# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 9 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 50 of 107 PageID: 197

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 32 of 41

Appendix B

MULTIPLE DISBURSEMENTS

DESCRIPTION:    A portion of certain student loans are disbursed in multiple segments. FMER tracks and ensures that multiple disbursements are made to the proper borrower or educational institution at the proper time.

PROVIDER:    FMER

TIME PERIOD:    FMER has agreed to provide this service with respect to (i) any loan which had its first disbursement prior to May 31, 2008 and (ii) any loan for which an application is received on or after May 31, 2008 and for which FMC has received the fee described in Appendix A to this Agreement. Such disbursements may extend beyond the termination of the Agreement.

COST:    No Cost

CONTACT:    Anne P. Bowen

LIBC/3315992.1

3

# [EXHIBIT B]

HUD-L -001598-21  04/21/2022 10:09:52 PM  Pg 10 of 18  Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA  Document 8-1  Filed 05/19/22  Page 51 of 107 PageID: 198

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 33 of 41

Appendix C

COLLECTION ACTIVITIES

FMER will perform certain activities with respect to collection of TERI-guaranteed loans as set forth in this Appendix C.  TERI-guaranteed loans that have been purchased by the Trusts prior to default are referred to herein as the "Securitized Loans".  All other TERI-guaranteed loans are referred to herein as the "Non-Securitized Loans."   As a condition precedent to FMER's obligations under this Appendix C,  TERI agrees that it will continue to remit payments owed to collection agencies (i) for post-default services, which amounts the collection agencies generally net out of recoveries being remitted to TERI; (ii) for loan rehabilitation services, which amounts TERI withholds from the purchase proceeds for such loans (i.e. amounts paid by the Trusts to TERI for the purchase of rehabilitated loans) and remits directly to the collection agencies; and (iii) for default prevention services with respect to Non-Securitized Loans to the extent such services are being managed by FMER pursuant to this Appendix C.

| | |
|---|---|
| DESCRIPTION: | Claims Processing and Review |
| | FMER will continue to review the claims packages to ensure that a "Guaranty Event" has occurred, that the applicable lender has complied with all of its obligations with regard to the servicing and origination of the loan. |
| PROVIDER: | FMER |
| TIME PERIOD: | June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.5 hereof. |
| COST: | ███████████████████ Same charge for Securitized Loans, but payable only by the offsets described in the Debtors Motion for Order Pursuant to Sections 105, 362 and 363 of the Bankruptcy Code Authorizing Debtor Honor Certain of its Guaranty Obligations and Purchase Defaulted Loans Using Cash in certain Pledged Accounts Established for the Benefit of the Trusts ("Motion to Pay Trust Claims") |
| CONTACT: | Anne P. Bowen |

4

[EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 11 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 52 of 107 PageID: 199

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 34 of 41

DESCRIPTION:  Default Prevention

        Refers to collection activities designed to prevent a loan from defaulting.

PROVIDER:   FMER

TIME PERIOD:  June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.5
        hereof.

COST:     █████████████████ Same charge for Securitized
Loans, but payable only by the Offsets described in the Motion to Pay
Trust Claims.

CONTACT:   Anne P. Bowen

DESCRIPTION:  Post-Default Collections

        Costs of oversight and administration of the efforts to collect on defaulted
loans.

PROVIDER:   FMER

TIME PERIOD:  June 1, 2008 – July 31, 2008, unless extended pursuant to Section 1.4
        hereof.

COST:     ██████████████████████

        ██████████████████████

CONTACT:   Anne P. Bowen

LIBC/3315992.1

# [EXHIBIT B]

<u>Appendix D</u>

INFRASTRUCTURE

The Information Technology services provided under this Appendix D shall be provided by
FMC and/or FMER in a reasonable manner consistent with past service level agreements.
Neither FMC nor FMER makes any further representation or warranty with regard to the services
to be provided hereunder and specifically disclaims any implied warranty of fitness for a
particular purpose.

"Acceptance" of FMC and/or FMER deliverables hereunder shall occur no later than the
fifth business day following the date such deliverables are provided. In the event TERI notifies
FMC or FMER of any deficiencies within five (5) business days of the date such deliverables are
provided, FMC and/or FMER shall attempt to resolve such deficiencies, subject to the terms and
conditions of the Agreement and Appendix D. In no event shall FMC and/or FMER have any
obligation to TERI after the later of (i) "acceptance" of any deliverable hereunder and (ii) the
expiration or termination of this Agreement.

Applications shall be maintained for TERI in a "Run Only" mode. Operating capacity
shall be provided at the same level provided immediately prior to the effective date of this
Agreement. Except as requested by TERI and agreed to in writing by FMC, neither FMC nor
FMER shall be required to develop source code and system changes will be made only as
necessary to fix malfunctioning or nonfunctioning systems or system components. FMC may in
its sole discretion accept or reject any request for source code development or system
enhancements. All services to be provided hereunder, including any agreed-upon projects
requiring source code development or system enhancements, will be performed in accordance
with the policies, procedures and processes of FMC and/or FMER.

TERI acknowledges and agrees that it shall be solely responsible for the provision of
services from third parties following the term of this Agreement, including without limitation the
identification of appropriate vendors, negotiation of agreements with such third parties and all
related costs, including costs of purchase and transfer or delivery by FMC or FMER. Except as
may otherwise be provided in this Appendix D, neither FMC nor FMER shall have any
obligation or liability to TERI with respect to the provision of services from third parties by
TERI, including without limitation with respect to software and equipment licensing, web
hosting and domain name registration, networks, "Right to Use" agreements, outsourcing, ASP
relationships, or timesharing. Neither FMC nor FMER shall be held responsible for any delays
in transition service delivery caused by TERI or any third party providers to TERI, FMC or
FMER.

Nothing in this Agreement or Appendix D shall require FMC or FMER to maintain
permanent internal or external network connectivity on behalf of TERI, and TERI acknowledges
that FMC and FMER intend to terminate any such connectivity following the termination of this
Agreement (or upon termination of the Services listed in this Appendix D, if earlier). At all
times during the term of this Agreement, TERI and each of its employees, consultants and agents
shall (i) comply with all state, federal and local acts, statutes, rules, regulations and published

LIBC/3315992.1

# [EXHIBIT B]

guidelines concerning the security, confidentiality, handling, disclosure, use and protection of consumer or customer information and (ii) adhere to FMC's policies and standards regarding information technology and security, including acceptable email and internet use and the Information Security Policy of FMC.

<u>DESCRIPTION</u>:       IT Support

TERI shall acquire and deploy all hardware and operating infrastructure related to operating its environment and shall not acquire any assets from FMC and/or FMER, including but not limited to desktops/laptops, WAN/LAN, switches, network services, PBX and phones, hand-held devices (including PDA devices and mobile phones), physical network, firewalls and security appliances, operating systems or office support software. Following the term of this Agreement (or upon termination of the Services listed in this Appendix D, if earlier), TERI shall return, or have returned, to FMER all equipment as to which FMC and/or FMER has an ownership or leasehold interest, including without limitation all desktops/laptops, phones, hand-held devices (including PDA devices and mobile phones), network equipment and computer peripherals.

During the term of this Agreement and subject to the terms of this Appendix D, FMC shall provide:

Continued availability of current internal and external network connectivity, including external access to the existing applications hosted for TERI back-office business processes, administrative and college access business processes

Continued availability of the following websites:

www.teri.org - S&M website hosted by FMER

www.tericollegeplanning.org - S&M website hosted by FMER

www.coachprogram.org - S&M website hosted by FMER

www.thinkcollegeearly.com - S&M website hosted by FMER

www.bhep.org - S&M website hosted by FMER

www.pathwaystocollege.net - College Access website hosted by web.com

http://teri.webexone.com/login.asp?loc=&link= - Intranet hosted by Webex

http://www.williamsprinting.com/admin/login.asp  - Fulfillment Website

LIBC/3315992.1

# [EXHIBIT B]

1 wiki website at Brockton hosted by icdsoft.com

Continued availability of current Window's domain, services and server applications supporting user authentication, printing, file storage, intranet, email, backups and electronic fax

Continued availability of existing user workstations (and/or laptops) with their legally licensed software, to the extent previously installed and supported by FMC and/or FMER

Continued availability of existing internal and external (in bound and out bound) phone and fax service including toll free services

Continued availability of existing computer peripherals including network and local printers, directly attached scanners, and connectivity for printing/scanning for leased reprographic business hubs

Continued availability of current wireless service and associated wireless telephone and PDA devices – including replication with email and scheduling to Messaging server

Continued availability of current logical and physical security for the foregoing

PROVIDER:        FMC

TIME PERIOD:     June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

CONTACT:         Richard Ross

DESCRIPTION:     Business Applications

                 Continued availability, including maintenance of existing interfaces for, HR and Payroll transactions

                 Hosting of, and/or continued availability, including maintenance of existing interfaces for, Finance and Accounting software for transactions, reporting and budgeting

8

LIBC/3315992.1

# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 15 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 56 of 107 PageID: 203

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 38 of 41

Continued availability, including maintenance of existing interfaces for, data and provision of files and systems in support of TERI's risk management function

Continued availability, including maintenance of existing interfaces for, college-related contact management data for the TERI sales force.

**PROVIDER:**    FMC

**TIME PERIOD:**    June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D.

**CONTACT:**    Richard Ross

**DESCRIPTION:**    Business Processes

Delivery by FMER and/or FMC to TERI in machine readable format or otherwise in printed form of:

- all file-server based TERI end-user electronic files
- all SharePoint based TERI end-user electronic files
- all MS Exchange Data (emails, contacts, calendars) of TERI employees, to the extent permitted by law.

FMC and FMER agree to the logical deletion by FMC and FMER of the foregoing TERI end-user electronic files and MS Exchange Data, to the extent permitted by law. TERI acknowledges and agrees that it shall have no right to request, and FMC or FMER shall have no further obligation to deliver, any such data following logical deletion by FMC and/or FMER.

FMER and/or FMC shall cooperate in good faith with TERI regarding the independent provision by TERI of:

- Voice and data service provided by Verizon
- Web hosting and domain name registration in situations in which FMC and/or FMER have agreements for websites that were procured for TERI's benefit including delivery in machine readable format of static web pages and client side scripts.
- Agreements for HRMS and Payroll services, including delivery in machine readable format or otherwise in printed form of all related current and historic TERI data

9

LIBC/3315992.1

# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 16 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 57 of 107 PageID: 204

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 39 of 41

- Agreements for Finance and Accounting software, including delivery in machine readable format or otherwise in printed form of all related current and historic TERI data, accompanied by relevant file format descriptors, data dictionary and relevant end-user documentation necessary to consume the files, in each case to the extent such materials exist as of the date hereof and FMC and/or FMER has the right to transfer such materials.

FMC and FMER agree to the logical deletion by FMC and FMER of the foregoing current and historic TERI data, to the extent permitted by law. TERI acknowledges and agrees that it shall have no right to request, and FMC or FMER shall have no further obligation to deliver, any such data following logical deletion by FMC and/or FMER.

FMER and/or FMC shall cooperate in good faith with TERI regarding the independent provision by TERI of:

- Agreements for salesforce.com software, including delivery in machine readable format or otherwise in printed form of all related current and historic college-related contact management data, accompanied by relevant file format descriptors, data dictionary and relevant end-user documentation necessary to consume the files, in each case to the extent such materials exist as of the date hereof and FMC and/or FMER has the right to transfer such materials.

| | |
|---|---|
| PROVIDER: | FMC |
| TIME PERIOD: | June 1, 2008 through July 31, 2008, unless earlier terminated pursuant to Section 1.5 of this Agreement or extended pursuant to Section 1.5 hereof. In the event of termination of this Agreement, FMC shall have no further obligation to provide any services under this Appendix D. |
| CONTACT: | Richard Ross |
| COST: | The following shall apply to all services provided under this Appendix D: |

---

1 The monthly rate will be adjusted to reflect any termination of services or of the Agreement during a month."

10

LIBC/3315992.1

# [EXHIBIT B]

HUD-L -001598-21   04/21/2022 10:09:52 PM   Pg 17 of 18   Trans ID: LCV20221627459
Case 2:22-cv-02713-MCA-JSA   Document 8-1   Filed 05/19/22   Page 58 of 107 PageID: 205

Case 08-12540   Doc 1171-1   Filed 11/02/10   Entered 11/02/10 15:31:24   Desc
Exhibits 1-3   Page 40 of 41



Neither FMC nor FMER shall engage any third parties with respect to
services to be provided hereunder without (i) providing TERI with a
written statement describing the nature and scope of such engagement,
together with a cost estimate, and (ii) TERI's prior written approval. TERI
shall provide any approval or disapproval of such engagement as soon as
practicable and in no event later than the second business day following
delivery by FMC and/or FMER of such written statement.  TERI shall
reimburse FMC and/or FMER for the costs of any third-party engagement
approved by TERI, unless the parties otherwise agree in writing.

FMC and/or FMER shall provide services set forth in Section 2.1 of the
Agreement on a time and materials basis.

FMC and/or FMER will provide enhancement services as requested by
TERI and agreed to by FMC on a time and materials basis.

11

LIBC/3315992.1

# [EXHIBIT B]

Case 08-12540    Doc 1171-1    Filed 11/02/10    Entered 11/02/10 15:31:24    Desc
Exhibits 1-3    Page 41 of 41

<u>Appendix E</u>

Two years of data derived from AES's MR-50 and MR-53 reports, as well as comparable data
from loan servicers other than AES to which TERI is entitled under its guaranty agreements with
lenders

A copy of data housed in the ALE

A copy of data housed in the RMS

A copy of data housed in the Orig APP FMER systems

A final update to the Guaranty Access Database

A copy of the data and results of the validation study

LIBC/3315992.1

# [EXHIBIT B]

## TENTH AMENDMENT TO
## DEFAULT PREVENTION AND COLLECTION SERVICES AGREEMENT

This Tenth Amendment to the Default Prevention and Collection Services Agreement (this "Amendment") is entered into as of September 27, 2021, by and between U.S. Bank National. Association, as successor Special Servicer, a national banking association with a principal place of business at 60 Livingston Avenue, EP-MN-WS3D, St. Paul MN 55107 (together with its successors and assigns, the "Special Servicer") and Transworld Systems Inc. (including but not limited to as assignee of NCO Financial Systems, Inc. ("NCO")), a corporation organized under the laws of the State of California having a place of business at 500 Virginia Drive, Suite 514, Fort Washington, PA 19034 (together with its successors and assigns, "TSI"), and amends that certain Default Prevention and Collection Services Agreement entered into by and between First Marblehead Education Resources, Inc. ("FMER"), the initial Special Servicer, and NCO and dated as of March 1, 2009 (the "Original Agreement"), as amended by that certain First Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of May 1, 2009 (the "First Amendment") and by that certain Second Amendment to Default Prevention and Collection Services Agreement entered into by and between FMER and NCO and dated as of June 15, 2012 (the "Second Amendment") and by that certain Third Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S. Bank and NCO dated June 21, 2012 (the "Third Amendment"), and by that certain Fourth Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S. Bank and NCO dated July 1, 2014 (the "Fourth Amendment"). The Original Agreement together with the First Amendment, Second Amendment, Third Amendment and Fourth Amendment will be collectively referred to as the "NCO Agreement", The NCO Agreement has been amended by that certain Fifth Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S Bank and TSI dated July 1, 2015 (the "Fifth Amendment"), and by that certain Sixth Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S Bank and TSI dated January 1, 2016 ("the Sixth Amendment"), and by that certain Seventh Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S Bank and TSI dated January 1, 2017 (the "Seventh Amendment"), and by that certain Eighth Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S Bank and TSI dated January 31, 2018 (the "Eighth Amendment"), and by that certain Ninth Amendment to Default Prevention and Collection Services Agreement entered into by and between U.S Bank and TSI dated January 31, 2019 (the "Ninth Amendment"). The NCO Agreement together with Fifth Amendment, Sixth Amendment, Seventh Amendment, Eighth Amendment and Ninth Amendment will be collectively referred to as the "TSI Agreement" herein after. The TSI Agreement as supplemented and amended by this Amendment and as may be further amended from time to time pursuant to Section 11.10, shall collectively be referred to as the "Agreement").

## RECITALS

WHEREAS, pursuant to that certain (i) Special Servicing Agreement dated as of March 1, 2009 (the "March SSA") by and among FMER as special servicer, U.S. Bank National Association as back-up special servicer (in such capacity the "Back-Up Special Servicer") and



PLAINTIFF 002768

each of the Trusts listed on Schedule A to the March SSA and (ii) Special Servicing Agreement dated as of May 1, 2009 (the "May SSA", together with the March. SSA, the "Special Servicing Agreements") by and among FMER as special servicer, U.S. Bank as back-up special servicer, Ambac Assurance Corporation ("Ambac") and each of the Trusts listed on Schedule A to the May SSA, the Trusts appointed FMER as the initial Special Servicer and U.S. Bank as the Back-Up Special Servicer for the purposes of providing default prevention, collection and other special services duties to the Trusts identified in the Special Servicing Agreements (collectively, the "Trusts" and individually, a "Trust") in accordance with the terms of the Special Servicing Agreements.

WHEREAS, pursuant to the Special Servicing Agreements, FMER as initial Special Servicer arranged for the outsourcing to NCO of certain default prevention and collection activities of the Special Servicer under the Special Servicing Agreements in the event that U.S. Bank became the successor Special Servicer (the "Successor Special Servicer") under the Special Servicing Agreements;

WHEREAS, as of June 21, 2012, the Successor Special Servicer assumed the duties of the Special Servicer under the Special Servicing Agreements and FMER notified NCO of such assumption;

WHEREAS, pursuant to the NCO Agreement, upon being notified of the assumption by U.S. Bank as Back-up Special Servicer of the duties of the Special Servicer under the Special Servicing Agreements on behalf of the Trusts, NCO began performance of the Services specified in the NCO Agreement;

WHEREAS, June 21, 2012, is the "Effective Date" for purposes of the Agreement;

WHEREAS, on or about November 1, 2014, TSI acquired the rights, obligations and duties of NCO under the Agreement and the parties wish to amend the Agreement to update the default prevention, collection and other special services to be provided by TSI thereunder;

WHEREAS, Successor Special Servicer and TSI now wish to enter into this Tenth Amendment to the Agreement for the express purpose of revising all relevant Agreement terms as necessary to clarify the indemnification obligations of the Successor Special Servicer, including but not limited to those under Article VIII – INDEMNIFICATION AND EXCLUSION, of the Agreement;

NOW THEREFORE, in consideration of the premises set forth above, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## AGREEMENT

1.     Recitals Incorporated Herein. The recitals set forth at the beginning of this Amendment are true and accurate and are incorporated herein by this reference.

2



PLAINTIFF 002769

2.    <u>Defined Terms</u>. All capitalized terms in this Amendment shall have the same meaning given to them in the Agreement, unless otherwise expressly stated herein.

3.    <u>Amendments of the Agreement</u>. The Agreement is hereby amended in the following respects:

3.1    Section 1.1, <u>Definitions</u>, of the Agreement is amended by inserting (in alphabetical order, as appropriate) the following defined term:

> **"Cosigner Release Request" means the receipt, review, approval or denial of any request or application by a Borrower, or its cosigner, to have a cosigner released from an ASL or any private loan obligation and communication to PHEAA of such approval or denial for purposes of PHEAA's communication with the Borrower or its cosigner.**

3.2    Section 1.1, <u>Definitions</u>, of the Agreement is further amended by deleting and replacing the defined term "Services" with the following:

> "Services" means Default Collection Services, Default Prevention Services, Fraud Claims Review, Bankruptcy and Probate Services, Collections Agency Management Services, Cosigner Release Requests, and the Other Services.

3.3    Section 2.5, <u>Special Accounts</u>, is amended as follows:

i.    Subsection (c) is added in its entirety as follows;

> (c) TSI will be responsible for receiving, reviewing, and approving or denying such Cosigner Release Requests, as defined in Section 1.1. TSI will not be responsible for implementing any decision that it makes as to the approval or denial of such Cosigner Release Requests. The process for handling Cosigner Release Requests is generally described in <u>Exhibit F</u>.

3.4    Section 8.1, <u>Indemnity</u>, is amended as follows:

i.    Subsection (c) is deleted in its entirety and replaced as follows:

> (c) <u>Indemnification Obligations of Successor Special Servicer</u>
>
> Subject to the rights and limitations in this Agreement and in the Special Servicing Agreement, Successor Special Servicer shall defend, indemnify, and hold harmless TSI, its officers, directors, employees, agents, affiliates,

3



[EXHIBIT C]

PLAINTIFF 002770

and subsidiaries, individually and collectively (each, a "TSI Indemnified Party"), from and against any and all claims arising out of or resulting from any action by a third party against such TSI Indemnified Party that is based on any claims resulting from (i) the breach of any representation or warranty, covenant, or agreement of Successor Special Servicer contained in this Agreement, or any amendment thereto; (ii) any information or materials provided by Successor Special Servicer to TSI for use in providing the Services, including but not limited to Cosigner Release Requests; or (iii) the nature or use of Successor Special Servicer's products or services.  In addition, Successor Special Servicer shall reimburse TSI for all fees and costs incurred by TSI resulting from any third party investigation of the acts and practices of Successor Special Servicer, and/or its subsidiaries and affiliates, including expenses related to compliance with any third party subpoena or with any other discovery proceeding.

3.5   Section 11.1 of the Agreement is hereby amended and replaced in its entirety as follows:

"11.1 <u>Notice Procedure; Addresses</u>.  All notices, demands, and other communications hereunder shall be in writing and shall be deemed to have been duly given and received at the time delivered by hand, if personally delivered; when receipt is acknowledged, if mailed by certified mail, postage prepaid, return receipt requested; the next business day after timely delivery to the courier, if sent by overnight air courier guaranteeing next-day delivery; and when received if sent by any other means as follows:

If to Special Servicer:

_____

If to Special SubServicer:

_____

If to TSI:

500 Virginia Drive
Attn: Jonathan Thompson, Chief Legal & Compliance Officer
Suite 514
Fort Washington, PA 19034

4



PLAINTIFF 002771

The persons or addresses to which mailings or deliveries shall be made may be changed from time to time by notice given pursuant to the provisions of this Section 11.1."

3.6     Exhibit F to the Agreement is hereby deleted and replaced in its entirety with the form of Exhibit F attached to this Amendment.

3.7     Exhibit G to the Agreement is hereby amended as follows:

i.      "Section 1 : Market share limitations" is deleted in its entirety and replaced as follows:

### Section 1: Market share limitations:

a.


Confidential - Trade Secret

b.
Confidential - Trade Secret

c.
Confidential - Trade Secret

ii.     "Pre-default" definition is deleted in its entirety from Section 2: OCA Performance Measurement.

iii.    "Section 3: Market share allocation and adjustments" is deleted in its entirety and replaced as follows:

5


[EXHIBIT C]

PLAINTIFF 002772

## Section 3: Market Share Allocation and Adjustments:

a.


Confidential - Trade Secret

b.


Confidential - Trade Secret



[EXHIBIT C]

PLAINTIFF 002773



Confidential - Trade Secret

4.      Acknowledgement. Successor Special Servicer expressly acknowledges and understands that it has entered into this Agreement and assumed the indemnification obligations, both retroactively and prospectively, imposed on the Successor Special Servicer in order to induce TSI to perform or to continue to perform the Cosigner Releases, and acknowledges that TSI is relying on this Agreement in serving or continuing to serve in such capacity.

5.      Full Force and Effect of Amendment.  This Amendment amends the Agreement only as expressly set forth in this Amendment. As amended herein, the Agreement remains in full force and effect according to its terms. This Amendment shall be effective as of the date first set forth above. All references in the Agreement to the Agreement shall be deemed to mean the Agreement as modified hereby. The parties hereto agree to be bound by the terms and conditions of the Agreement, as amended by this Amendment, as though such terms and conditions were set forth therein. This Amendment may not be amended or otherwise modified except as provided in the Agreement. The failure or unenforceability of any provision hereof shall not affect the other provisions of this Amendment or the Agreement.

6.      Amendment Controls. In the case of conflict with respect to any terms and conditions of this Amendment and the Agreement, the terms and conditions of this Amendment shall control.

7.      Multiple Counterparts. This Amendment may be executed in multiple counterparts, each of which shall be deemed an original for all purposes and all of which shall be deemed, collectively, one agreement, but in making proof hereof it shall not be necessary to exhibit more than one such counterpart. Delivery of an executed counterpart of this Amendment by facsimile or pdf electronic transmission shall be deemed as effective as delivery of an originally executed counterpart.

8.      GOVERNING LAW. THIS AMENDMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF OHIO, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN TO THOSE OF THE STATE OF OHIO. EACH PARTY WAIVES ITS RIGHT TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY DISPUTE IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS.

7

# [EXHIBIT C]

PLAINTIFF 002774

IN WITNESS WHEREOF, the parties hereto have caused this Tenth Amendment to the Default Prevention and Collection Services Agreement to be executed as of the date first written above.

U.S. BANK NATIONAL ASSOCIATION, as Successor Special Servicer under the Special Servicing Agreements

By: _____

Name: *Eve D. Kaplan*

Title: *Senior Vice President*


TRANSWORLD SYSTEMS INC.

By: _____ *Ralph Lyons*

Name: Ralph Lyons

Title: SVP

8

# [EXHIBIT C]

PLAINTIFF 002775

## EXHIBIT F
## NON-TRADITIONAL COLLECTION SERVICES

**Bankruptcy Servicing:**

In the event any debtor with respect to any ASL that is the subject of Services becomes a debtor under the U.S. Bankruptcy Code, TSI shall assign the account to its internal Bankruptcy Processing Unit.  TSI shall provide the following services for accounts with a balance greater than $175.00, that is within the applicable Statute of Limitations and the Bankruptcy Case is within the Claims Bar Date at the time of placement;

    I.    Timely file proofs of claim ("Proofs of Claim") (as required or permitted by the Bankruptcy Code) on behalf of the Trust in Chapter 7 asset cases as well as Chapter and 13 cases on accounts placed.

    II.    Proofs of Claim will be monitored and amended when necessary to ensure the proper payment and receipt of notices from the Bankruptcy Court.

    III.    TSI, on behalf of the Trusts, shall be responsible for responding to any Objections lodged in response to a filed Proof of Claim.  However, such Services, including any costs or fees associated with retaining counsel to assist in responding to such Objections, may be billed to the applicable Trust as appropriate.

    IV.    Shall process all Proceeds which are received from Trustees or a Debtor's bankruptcy estate in all bankruptcy cases in which it has filed Proofs of Claim in compliance with the Agreement.

In the event any debtor with respect to any ASL that is the subject of Services initiates an Adversary as part of a Bankruptcy filing to attempt to discharge any ASL, TSI shall assign the Adversary to external counsel who is familiar with handling Adversary matters.  External Counsel is authorized to bill the applicable Trust(s), through TSI for the defense of the Adversary at an hourly rate.


**Probate Servicing:**

In the event any debtor with respect to any ASL that is the subject of Services becomes deceased, collection efforts will continue from the non-deceased consumer.  If there is no surviving consumer, TSI shall assign the account for deceased and probate recovery, provided the account is at least $175.00, the following services will be provided, as deemed necessary based on TSI's industry experience.

    I.    Conduct a search for an open and viable estate.

    II.    If a viable estate is identified a claim will be filled on behalf of the Trust in compliance with TSI's established business model.



PLAINTIFF 002776

III.     Monitor the claim to ensure the proper payments are made.

IV.     If no estate is found, TSI will attempt to identify the Personal Representative as defined by law to determine if a repayment option is available.

**Fraud Claims Review:**

In the event any debtor with respect to any ASL that is the subject of Services alleges that they are the victim of fraud or identity theft ("Claimant"), the claim will be handled as follows;

I.     Either TSI or its Subservicer will forward a copy of a fraud affidavit to the Claimant.

II.     Once the fraud affidavit is completed and returned by the Claimant, it will be investigated by an internal team at TSI.

III.     TSI will either validate the claim as true and close the account appropriately or respond to the consumer with evidence as to why the claim was denied.

Cosigner Release Requests:



Confidential - Trade Secret

# [EXHIBIT C]

PLAINTIFF 002777

UNITED STATES OF AMERICA

## CONSUMER FINANCIAL PROTECTION BUREAU

**2017-CFPB-0018**

|  |
|---|
| **In the matter of:** |
| **TRANSWORLD SYSTEMS, INC.** |

**STIPULATION AND CONSENT
TO THE ISSUANCE OF
A CONSENT ORDER**

The Consumer Financial Protection Bureau (Bureau) intends to initiate an administrative proceeding against Transworld Systems, Inc. (Respondent), under 12 U.S.C. §§ 5563 and 5565, for its unfair and deceptive practices with regard to Collections Lawsuits in violation of the CFPA's prohibition on unfair and deceptive acts or practices, 12 U.S.C. §§ 5531, 5536.

Respondent, in the interest of compliance and resolution of the matter, and without admitting or denying any wrongdoing, consents to the issuance of a Consent Order substantially in the form of the one to which this Stipulation and Consent to the Issuance of a Consent Order is attached (Consent Order), which is incorporated by reference.

In consideration of the above premises, Respondent agrees to the following:

### Jurisdiction

1. The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the Consumer Financial Protection Act of 2010 (CFPA), 12 U.S.C. §§ 5563, 5565.



[EXHIBIT D]

## Consent

2. Respondent agrees to the issuance of the Consent Order, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

3. Respondent agrees that the Consent Order will be deemed an "order issued with the consent of the person concerned" under 12 U.S.C. § 5563(b)(4), and agrees that the Consent Order will become a final order, effective upon issuance, and will be fully enforceable by the Bureau under 12 U.S.C. §§ 5563(d)(1) and 5565.

4. Respondent voluntarily enters into this Stipulation and Consent to the Issuance of a Consent Order.

5. The Consent Order resolves only Respondent's potential liability for law violations that the Bureau asserted or might have asserted based on the practices described in Section V of the Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. Respondent acknowledges that no promise or representation has been made by the Bureau or any employee, agent, or representative of the Bureau, about any liability outside of this action that may have arisen or may arise from the facts underlying this action or immunity from any such liability.

6. Respondent agrees that the facts described in Section V of the Consent Order will be taken as true and be given collateral estoppel effect, without further proof, in any proceeding before the Bureau to enforce the Consent Order, or in any subsequent civil litigation by the Bureau to enforce the Consent Order or its rights to any payment or monetary judgment under the Consent Order.



[EXHIBIT D]

7. The terms and provisions of this Stipulation and the Consent Order will be binding upon, and inure to the benefit of, the parties hereto and their successors in interest.

8. Respondent agrees that the Bureau may present the Consent Order to the Bureau Director for signature and entry without further notice.

### Waivers

9. Respondent, by consenting to this Stipulation, waives:

   a. Any right to service of the Consent Order, and agrees that issuance of the Consent Order will constitute notice to the Respondent of its terms and conditions;

   b. Any objection to the jurisdiction of the Bureau, including, without limitation, under section 1053 of the CFPA, 12 U.S.C. § 5563;

   c. The rights to all hearings under the statutory provisions under which the proceeding is to be or has been instituted; the filing of proposed findings of fact and conclusions of law; proceedings before, and a recommended decision by, a hearing officer; all post-hearing procedures; and any other procedural right available under section 1053 of the CFPA, 12 U.S.C. § 5563, or 12 C.F.R. pt. 1081;

   d. The right to seek any administrative or judicial review of the Consent Order;

   e. Any claim for fees, costs, or expenses against the Bureau, or any of its agents or employees, and any other governmental entity, related in any way to this enforcement matter or the Consent Order, whether arising under common law or under the terms of any statute, including, but not

3



[EXHIBIT D]

limited to the Equal Access to Justice Act and the Small Business Regulatory Enforcement Fairness Act of 1996; for these purposes, Respondent agrees that Respondent is not the prevailing party in this action because the parties have reached a good-faith settlement;

f.   Any other right to challenge or contest the validity of the Consent Order;

g.   Such provisions of the Bureau's rules or other requirements of law as may be construed to prevent any Bureau employee from participating in the preparation of, or advising the Director as to, any order, opinion, finding of fact, or conclusion of law to be entered in connection with this Stipulation or the Consent Order; and

h.   Any right to claim bias or prejudgment by the Director based on the consideration of or discussions concerning settlement of all or any part of the proceeding.

TRANSWORLD SYSTEMS, INC.  BY:

_____          SEPTEMBER 14, 2017

Joseph Laughlin                                                      Date
Chief Executive Officer



# [EXHIBIT D]

# UNITED STATES OF AMERICA
## CONSUMER FINANCIAL PROTECTION BUREAU

ADMINISTRATIVE PROCEEDING File
2017-CFPB-0018

| | |
|---|---|
| In the Matter of:<br><br>**TRANSWORLD SYSTEMS, INC.** | **CONSENT ORDER** |

## I.
## Overview

The Consumer Financial Protection Bureau (Bureau) has reviewed the debt collections litigation practices of the Attorney Network business unit of Transworld Systems, Inc. ("TSI") ("Respondent"), the agent and Service Provider for fifteen (15) Delaware statutory trusts referred to as the National Collegiate Student Loan Trusts ("NCSLTs", or "the Trusts", which are the National Collegiate Master Student Loan Trust, NCSLT 2003-1, NCSLT 2004-1, NCSLT 2004-2, NCSLT 2005-1, NCSLT 2005-2, NCSLT 2005-3, NCSLT 2006-1, NCSLT 2006-2, NCSLT 2006-3, NCSLT 2006-4, NCSLT 2007-1, NCSLT 2007-2, NCSLT 2007-3, and NCSLT 2007-4), and has identified violations of sections 1031(a) and 1036(a)(1) of the Consumer Financial Protection Act of 2010 (CFPA). Under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, the Bureau issues this Consent Order (Consent Order).

To collect on defaulted private student loans, Law Firms engaged by Respondent's Attorney Network business unit filed debt Collections Lawsuits in state

1



[EXHIBIT E]

courts across the country on behalf of the Trusts. In support of many of these lawsuits, Respondent executed affidavits that falsely claimed personal knowledge of the account records and the consumer's debt, and in many cases, personal knowledge of the chain of assignments establishing ownership of the loans. In addition, since November 1, 2014, Law Firms hired by Respondent filed hundreds of debt Collections Lawsuits without the documentation necessary to prove Trust ownership of the loans.

## II

## Jurisdiction

1.  The Bureau has jurisdiction over this matter under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565.

## III
## Stipulation

2.  Respondent has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated September 14, 2017 (Stipulation), which is incorporated by reference and is accepted by the Bureau. By this Stipulation, Respondent has consented to the issuance of this Consent Order by the Bureau under sections 1053 and 1055 of the CFPA, 12 U.S.C. §§ 5563, 5565, without admitting or denying any of the findings of fact or conclusions of law, except that Respondent admits the facts necessary to establish the Bureau's jurisdiction over Respondent and the subject matter of this action.

## IV
## Definitions



# [EXHIBIT E]

3.     The following definitions apply to this Consent Order:

a.   "Affiant" means any signatory to an Affidavit, signing in his or her capacity as an employee or agent of Respondent, but excluding one signing solely as a notary or witness to the act of signing.

b.   "Affidavit" means any sworn statement filed with a court in connection with a Collections Lawsuit.

c.   "Board" means TSI's duly elected and acting Board of Directors.

d.   "Clearly and Prominently" means:

   i.   as to written information: written in a type size and location sufficient for an ordinary consumer to read and comprehend it, and disclosed in a manner that would be easily recognizable and understandable in language and syntax to an ordinary consumer; if the information is contained in a multi-page print document, the disclosure appears on the first page.

   ii.   as to information presented orally: spoken and disclosed in a volume, cadence, and syntax sufficient for an ordinary consumer to hear and comprehend.

e.   "Collections Lawsuits" means attempts by a Law Firm engaged by Respondent's Attorney Network business unit, for an account owned or alleged to be owned by a Trust, through judicial processes in the United States of America, to collect or establish a Consumer's liability for a Debt.

f.   "Consumer" means any natural person obligated or allegedly obligated to pay any Debt.

3

# [EXHIBIT E]

g.  "Debt" means any obligation or alleged obligation of a Consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes, whether or not such obligation has been reduced to judgment.

h.  "Effective Date" means the date on which the Consent Order is issued.

i.  "Enforcement Director" means the Assistant Director of the Office of Enforcement for the Consumer Financial Protection Bureau, or his/her delegate.

j.  "Law Firm" means a law firm engaged by Respondent's Attorney Network business unit to collect student loan Debt on behalf of the National Collegiate Student Loan Trusts.

k.  "Regional Director" means the Regional Director for the Northeast Region for the Office of Supervision for the Consumer Financial Protection Bureau, or his/her delegate.

l.  "Related Consumer Action" means a private action by or on behalf of one or more consumers or an enforcement action by another governmental agency brought against Respondent based on substantially the same facts as described in Section V of this Consent Order.

m.  "Relevant Period" includes the period from November 1, 2014 to April 25, 2016.

n.  "Respondent" means Transworld Systems, Inc., and its successors and assigns.

4

# [EXHIBIT E]

    o.   "Service Providers" means any service provider, as defined in section

1002(26) of the CFPA, 12 U.S.C. § 5481, that provides or provided services

with respect to the servicing of the student loans owned by a NCSLT.

## V.

### Bureau Findings and Conclusions

The Bureau finds the following:

4.    The National Collegiate Student Loan Trusts ("NCSLTs" or "the Trusts")

comprise fifteen (15) Delaware statutory trusts created between 2001 and

2007. The basic purpose of each Trust is to acquire a pool of student loans,

enter into the so-called trust-related agreements, and provide for the

administration of the Trusts and the servicing of student loans.

5.    The Trusts do not have any employees and all actions taken by the Trusts in

connection with loan servicing and collecting Debt are carried out by third

parties.

6.    Debt-collection activities on behalf of the Trusts are carried out by the

successor special servicer's sub-servicer pursuant to servicing agreements

with the successor special servicer.

7.    Sub-servicers that executed and notarized the deceptive affidavits did so as

Service Providers and agents of the Trusts.

8.    Law Firms that filed lawsuits on behalf of the Trusts did so as Service

Providers and agents of the Trusts.

# [EXHIBIT E]

9.   Respondent Transworld Systems, Inc. (TSI) is incorporated under the laws of the State of California and maintains a principal place of business in Ft. Washington, Pennsylvania.

10.   TSI maintains an office in Peachtree Corners, Georgia, where its employees execute and notarize affidavits for Collections Lawsuits brought on behalf of the Trusts.

11.   A national network of Law Firms engaged by Respondent file and prosecute Collections Lawsuits on behalf of the Trusts in courts across the country.

12.   TSI has operated as the successor sub-servicer to the successor special servicer of the Trusts since November 1, 2014.

13.   TSI is a "covered person" under 12 U.S.C. § 5481(6) because it is engaged in the collection of debt and is a Service Provider. 12 U.S.C. § 5481(15)(A)(x), (26).

14.   TSI is an agent and Service Provider of the Trusts.

### FALSE AND MISLEADING AFFIDAVITS AND TESTIMONY

15.   In connection with collecting or attempting to collect Debt from Consumers, between November 1, 2014 and April 25, 2016, Law Firms hired by Respondent on behalf of the Trusts initiated 37,689 Collections Lawsuits in courts across the country on behalf of the Trusts.

16.   In support of the Collections Lawsuits, Law Firms submitted Affidavits executed by Respondent and documents in support of the Trusts' claims that Consumers owed Debts to a Trust.

17.   Respondent executed and notarized Affidavits–often with attached exhibits–that were used by Law Firms in many of the Collections Lawsuits


[EXHIBIT E]

brought on behalf of the Trusts between November 1, 2014 and April 25, 2016.

18.   In these Affidavits, the Affiants swore that they had personal knowledge of the education loan records evidencing the Debt. In fact, in numerous instances, Affiants lacked personal knowledge of the education loan records evidencing the Debt when they executed the Affidavits.

19.   The Affiants also asserted that they were authorized and competent to testify about the Consumers' Debts through review of and "personal knowledge" of the business records, including electronic data in their possession. In fact, in certain instances, Affiants lacked personal knowledge of the business records, including the electronic data, showing that Consumers owed Debts to the Trusts. Affiants were instructed to review certain data on a computer screen as part of an effort to verify some information in the Affidavits about the Debts. Affiants, however, did not always know the source of the data on that screen, how the data was obtained or maintained, whether it was accurate, or whether that data meant that the Debt was in fact owed to the Trusts.

20.   Each Affiant also swore that he/she had "personal knowledge of the record management practices and procedures of Plaintiff [the Trust] and the practices and procedures Plaintiff requires of its loan servicers and other agents." In fact, certain Affiants lacked personal knowledge of the record management practices and procedures of the Trusts and the practices and procedures the Trusts required of its loan servicers and other agents.

# [EXHIBIT E]

21.   In many Affidavits, the Affiants also stated that "I have reviewed the chain of title records as business records" regarding the relevant account. In some cases, Affiants did not possess the chain of title records but reviewed "chain of title" records that were found online on a government portal maintained by the Securities and Exchange Commission. In numerous instances, Affiants did not review the chain of title records prior to executing the Affidavits.

22.   In certain Affidavits, the Affiants asserted that they had personal knowledge that the loans were transferred, sold, and assigned to the plaintiff Trusts on dates certain. In fact, in numerous instances, Affiants lacked personal knowledge of the chain of assignment records necessary to prove that the relevant Trust owned the subject loans.

23.   In some instances, certain Affiants complained to supervisors that they did not have personal knowledge of the representations made in the Affidavits. These affiants continued to execute Affidavits, however, for fear of losing their jobs.

24.   Affiants also provided live testimony in court, purportedly based on personal knowledge, similar to the statements made in the Affidavits as described in Paragraphs 18-22.

### FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

25.   From November 1, 2014 to April 25, 2016, on behalf of the Trusts, Law Firms filed numerous Collections Lawsuits against Consumers even though

8

# [EXHIBIT E]

the complete documentation needed to prove that the Trusts owned the loans did not exist.

26.   In these lawsuits, documentation of a complete chain of assignment evidencing that the subject loan was transferred to and owned by the Trust was lacking.

27.   In addition, Law Firms hired by Respondent on behalf of the Trusts filed numerous Collections Lawsuits where the loans in question were disbursed to the Consumers after the loans allegedly were transferred to the Trusts according to the chain of assignment documents.

28.   On numerous occasions, Law Firms hired by Respondent filed Collections Lawsuits even though the promissory note to prove that a Debt was owed did not exist.

29.   For each Collections Lawsuit described in Paragraphs 25-28, Law Firms hired by Respondent could not prove that a Debt was owed to the Trusts, if contested.

**Violations of the Consumer Financial Protection Act**

30.   Covered persons are prohibited from engaging "in any unfair, deceptive, or abusive act or practice" in violation of the CFPA. 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

31.   An act or practice is deceptive under the CFPA if it involves a material representation or omission that misleads, or is likely to mislead, a consumer acting reasonably under the circumstances.

32.   An act or practice is unfair if "(A) the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by



consumers; and (B) such substantial injury is not outweighed by countervailing benefits to consumers or competition." 12 U.S.C. § 5531(c)(1).

## FALSE AND MISLEADING COLLECTION AFFIDAVITS AND TESTIMONY

33.  In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent executed Affidavits that were used by Law Firms with many of the Collections Lawsuits filed by Law Firms on behalf of the Trusts in courts across the country, and in live testimony, Respondent represented, directly or indirectly, expressly or by implication, that:

   a.  Affiants had personal knowledge of the account records and the Debt;

   b.  Affiants had personal knowledge of the chain of assignment records evidencing Trust ownership of the subject loan; and

   c.  Affiants had personal knowledge of the record management practices and procedures of the Trusts and all prior servicers.

34.  In fact, as described in Paragraphs 18 to 24, in numerous instances, these representations were either false or the Affiant did not have a basis for making the representation.

35.  The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a Collections Lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

# [EXHIBIT E]

36.     Thus, representations by Respondent, as described in Paragraphs 18-24, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

## FILING LAWSUITS WITHOUT THE INTENT OR ABILITY TO PROVE THE CLAIMS, IF CONTESTED

37.     In numerous instances, in connection with collecting or attempting to collect Debt from Consumers, Respondent, acting through the Law Firms hired by Respondent on behalf of the Trusts, represented, directly or indirectly, expressly or by implication, that it could be proven in the Collections Lawsuits that the Trusts owned the loans in question and that the Consumers in question owed Debts to the Trusts, if contested.

38.     In fact, in numerous instances, Respondent lacked the complete chain of assignment documentation needed to prove Trust ownership of the subject loans and the promissory note needed to prove the existence of certain loans.

39.     The representations are material because they are likely to affect a Consumer's choice or conduct regarding how to respond to a lawsuit and are likely to mislead a Consumer acting reasonably under the circumstances.

40.     Thus, Respondent's representations, as described in Paragraphs 25-29, constitute deceptive acts or practices in violation of sections 1031(a) and 1036(a)(1)(B) of the CFPA, 12 U.S.C. §§ 5531(a), 5536(a)(1)(B).

41.     In addition, Respondent's acts and practices, caused or were likely to cause substantial injuries to consumers.

# [EXHIBIT E]

42. The injuries to consumers included, but were not limited to, all payments made, including garnishments of wages and bank accounts, to settle Debts not enforceable.

43. The injuries to consumers were not reasonably avoidable by consumers and were not outweighed by any countervailing benefits to consumers or to competition.

44. Thus, Respondent's conduct, as described in Paragraph 25-29, constitutes unfair acts or practices in violation of sections 1031(c) and 1036(a)(1)(B ) of the CFPA, 12 U.S.C. §§ 5531(c)(1), 5536(a)(1)(B).

## **ORDER**
## **VI**
## **Conduct Provisions**

**IT IS ORDERED**, under sections 1053 and 1055 of the CFPA, that:

45. Respondent and its officers, Service Providers, agents, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not violate sections 1031 and 1036 of the CFPA, 12 U.S.C. §§ 5531, 5536, and must take the following affirmative actions:

   a. Respondent shall take all actions necessary to comply with the terms of the Consent Order.

   b. Respondent must require that any Law Firm it retains in connection with the collection of student loans owned by the Trusts agree to abide by the terms and conditions of the Consent Order.

   c. Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed between November 1,



2014 and the Effective Date and that are missing the documentation described in subsection (f)(i)and (ii) of this Paragraph.

d.  Within ninety (90) days of the Effective Date, Respondent must identify all Collections Lawsuits that were filed seeking Debt outside the statute of limitations and provide this information to the successor special servicer or any other Service Provider of the Trusts.

e.  Within one-hundred twenty (120) days of the Effective Date, Respondent must provide to the successor special servicer and to the Bureau for each Consumer named in the suits identified in Paragraph 45c and 45d: the Consumer's name, all available contact information for the Consumer (including information in the possession of the attorneys who filed the suit), and the total amount of all payments made by the Consumer on or after the date on which the suit was filed.

f.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not initiate a Collections Lawsuit to collect Debt unless Respondent possesses:

    i.  the documentation necessary to prove that a Trust owns the loan, including but not limited to, documentation reflecting the complete chain of assignment from the Debt's originator to the specific Trust claiming ownership; and

    ii. a document signed by the Consumer, such as a promissory note, evidencing the agreement to pay the loan forming the basis of the Debt.

13

[EXHIBIT E]

g.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to initiate a Collections Lawsuit to collect on a loan for which the applicable statute of limitations has expired.

h.  Respondent shall establish written policies requiring Law Firms to confirm that the applicable statute of limitations has not expired at the time of the filing of the Collections Lawsuit;

i.  Respondent shall require Law Firms to provide a quarterly report to Respondent that includes, for each Collections Lawsuit, any data relevant to determining the applicable statute of limitations, such as date of lawsuit, date of default, and date of last payment, as well as identifies any lawsuits in which a consumer alleges in his pleadings that the lawsuit was filed outside the statute of limitations.

j.  Respondent shall not collect any Debt through a Collections Lawsuit that Respondent knows or learns was filed outside the statute of limitations, and if any such cases are pending, Respondent shall seek the immediate withdrawal or dismissal of the lawsuit.

k.  Respondent and its officers, agents, Service Providers, servants, employees, and attorneys who have actual notice of this Consent Order, whether acting directly or indirectly, may not cause Law Firms hired by Respondent on behalf of the Trusts to collect any Debt through

# [EXHIBIT E]

Collections Lawsuits that Respondent or its agents have any reason to believe may be unenforceable.

l.  Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, executing any Affidavit containing any misrepresentations, including false statements that:

i.  the Affiant is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

ii.  the Affiant has personal knowledge of the Consumer's debt;

iii.  the Affiant has personal knowledge of the loan's chain of assignment or ownership;

iv.  the Affiant has personal knowledge of the documents relating to the loan's chain of assignment or ownership;

v.  the Affidavit has been properly notarized if the Affidavit was not executed in the presence of a notary or if the notarization was otherwise not compliant with applicable notary laws; or

vi.  certain documents or records concerning the Debt forming the basis of the Collections Lawsuit have been reviewed by the Affiant.

46.  Respondent, its officers, agents, Service Providers, servants, employees, and attorneys, and all other persons in active concert or participation with any



of them, who receive actual notice of this Consent Order, whether acting directly or indirectly, are permanently restrained and prohibited from, in connection with the collection of a Debt, providing any testimony that contains any misrepresentations, including false statements that the witness:

    a.  is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records;

    b.  has personal knowledge of the Consumer's debt;

    c.  has personal knowledge of the loan's chain of assignment or ownership; or

    d.  has personal knowledge of the documents relating to the loan's chain of assignment or ownership.

47.  If Respondent determines that it engages in any conduct prohibited by this Order, including but not limited to Paragraphs 45-46 of this Order, Respondent promptly will take the necessary steps to ensure that it ceases any and all practices that violate this Order.

48.  Within ten (10) days of making the determination described in Paragraph 47 Respondent must submit to the Regional Director a report detailing (a) the practices that violate the Order, (b) the specific agents engaged in the practices in question, and (c) a plan to ensure that the practices cease and to remediate any harm resulting from the practices.

49.  With regard to pending Collections Lawsuits filed by a Law Firm in which Respondent executed an Affidavit that was filed in support of the pending Collection Lawsuit and that contains any misrepresentations—including but


[EXHIBIT E]

not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to withdraw such Affidavit unless the Trusts dismiss the suit in which the Affidavit was filed. Respondent shall take the steps necessary, including getting permission from the successor special servicer, to direct Law Firms acting on behalf of the Trusts to notify the court of the following in writing and must also simultaneously provide the court with a copy of the Consent Order entered into between the Bureau and the Respondent: "Plaintiff withdraws the affidavit of [insert name of Affiant] pursuant to Consent Order entered into by the Consumer Financial Protection Bureau and Transworld Systems, Inc."

50.    With regard to Collections Lawsuits that were filed in which Respondent executed an Affidavit that was filed with a court or in arbitration, and a judgment was entered, that contained any misrepresentations—including but not limited to false statements that the Affiant: (1) is familiar with or has personal knowledge of the Consumer's education loan records or the maintenance of those records, (2) has personal knowledge of the

# [EXHIBIT E]

Consumer's indebtedness, (3) has personal knowledge of the loan's chain of assignment or ownership, (4) has personal knowledge about the maintenance of documents relating to the loan's chain of assignment or ownership, or (5) has attached as an exhibit a true and correct copy of a document—Respondent must instruct the Law Firms to cease post-judgment enforcement activities and Respondent will take the steps necessary, including getting permission from the successor special servicer, to instruct the Law Firms acting on behalf of the Trusts to seek to remove, withdraw, or terminate any active wage garnishment, bank levies, and similar means of enforcing those judgments or settlements as well as cease accepting settlement payments related to any such Collections Lawsuits.

51. Respondents must cooperate in all respects with any directive from the successor special servicer acting on behalf of the Trusts to:

   a. Make certain disclosures in connection with the collection of Debt owned by the Trusts;

   b. Withdraw any Affidavit or Collection Lawsuit; or

   c. Provide loan information or documents to the successor special servicer, including but not limited to, information and documents related to:

      i.  Whether certain loans owned by the Trusts are no longer legally enforceable because the applicable statute of limitations has expired;

      ii. Whether Collections Lawsuits have been filed on any loans where sufficient documentation, including signed promissory notes and



documentation reflecting the complete chain of assignment from the Debt's originator to the Collection Lawsuit's named plaintiff, is not in the possession, custody or control of the Collection Lawsuit's named plaintiff to prove the existence of the Debt owed to the named plaintiff, or where the applicable statute of limitations has expired; and

iii. Whether judgments were obtained in Collections Lawsuits described in Paragraph 51(c)(ii) and the identity of Consumers from whom the Trusts obtained payments in response to those Collections Lawsuits, and the specific amounts collected from these Consumers.

## VII

## Compliance Plan

**IT IS FURTHER ORDERED** that:

52. Within ninety (90) days of the Effective Date, Respondent must submit to the Regional Director for review and determination of non-objection a compliance plan designed to ensure that the Attorney Network business unit of Respondent complies with all applicable Federal consumer financial laws with respect to Collections Lawsuits and the terms of this Consent Order (Compliance Plan). The Compliance Plan must include, at a minimum:

  a. Detailed steps for addressing each action required by this Consent Order;


[EXHIBIT E]

b.  Comprehensive, written policies and procedures designed to prevent violations of Federal consumer financial laws and associated risks of harm to Consumers with respect to Collections Lawsuits;

c.  An effective employee training program required for all employees with any involvement in Collections Lawsuits, including but not limited to Affiants, whose duties include reviewing, executing, preparing, processing, verifying, , or notarizing of Affidavits that includes regular, specific, comprehensive training in Federal consumer financial laws commensurate with individual job functions and duties;

d.  Implementation of reasonable and appropriate written policies and procedures to ensure the proper notarization processes for Affidavits, including that notaries place the Affiants under oath and witness their signatures;

e.  Implementation of reasonable and appropriate written policies and procedures to ensure that Affiants verify the accuracy of each statement made in an Affidavit before executing the Affidavit;

f.  Comprehensive, written policies and procedures designed to ensure that any Law Firms engaged by Respondent to collect Debt do not violate any Federal consumer financial laws, which must include at a minimum:

    i.  the Law Firm's duty to maintain adequate internal controls to ensure compliance with Federal consumer financial laws;

    ii.  the Law Firm's duty to provide adequate training on compliance with all applicable Federal consumer financial laws and



[EXHIBIT E]

Respondent's policies and procedures related to Collections
Lawsuits;

   iii.  Respondent's authority to conduct periodic onsite reviews of the
Law Firm's controls, performance, and information systems related
to Collections Lawsuits; and

   iv.  periodic review by Respondent of the Law Firm's controls,
performance, and information systems related to Collections
Lawsuits; and

  g.  Specific timeframes and deadlines for implementation of the steps
described above.

53. The Regional Director will have the discretion to make a determination of
non-objection to the Compliance Plan or direct Respondent to revise it. If
the Regional Director directs Respondent to revise the Compliance Plan,
Respondent must make the revisions and resubmit the Compliance Plan to
the Regional Director within thirty (30) days.

54. After receiving notification that the Regional Director has made a
determination of non-objection to the Compliance Plan or any amendments
thereto, Respondent must implement and adhere to the steps,
recommendations, deadlines, and timeframes outlined in the Compliance
Plan.

## VIII

## Role of the Board

**IT IS FURTHER ORDERED** that:

# [EXHIBIT E]

55.   Respondent's Board must review all submissions (including plans, reports, programs, policies, and procedures) required by this Consent Order prior to submission to the Bureau.

56.   Although this Consent Order requires Respondent to submit certain documents for the review or non-objection by the Regional Director, the Board will have the ultimate responsibility for proper and sound management of Respondent and for ensuring that Respondent complies with Federal consumer financial law and this Consent Order.

57.   In each instance that this Consent Order requires the Board to ensure adherence to or perform certain obligations of Respondent, the Board must:

   a.   Authorize whatever actions are necessary for Respondent to fully comply with the Consent Order;

   b.   Require timely reporting by management to the Board on the status of compliance obligations; and

   c.   Require timely and appropriate corrective action to remedy any material non-compliance with any failures to comply with Board directives related to this Section.

## IX

## Order to Pay Civil Money Penalties

**IT IS FURTHER ORDERED** that:

58.   Under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c), by reason of the violations of law described in Section V of this Consent Order, and taking



[EXHIBIT E]

into account the factors in 12 U.S.C. § 5565(c)(3), Respondent must pay a civil money penalty of $2.5 million to the Bureau.

59. Within ten (10) days of the Effective Date, Respondent must pay $1.5 million of the civil money penalty by wire transfer to the Bureau or to the Bureau's agent in compliance with the Bureau's wiring instructions. The remainder of the civil money penalty shall be paid in one installment within sixty (60) days of the Effective Date.

60. The civil money penalty paid under this Consent Order will be deposited in the Civil Penalty Fund of the Bureau as required by section 1017(d) of the CFPA, 12 U.S.C. § 5497(d).

61. Respondent must treat the civil money penalty paid under this Consent Order as a penalty paid to the government for all purposes. Regardless of how the Bureau ultimately uses those funds, Respondent may not:

   a. Claim, assert, or apply for a tax deduction, tax credit, or any other tax benefit for any civil money penalty paid under this Consent Order; or

   b. Seek or accept, directly or indirectly, reimbursement or indemnification from any source, including but not limited to payment made under any insurance policy, with regard to any civil money penalty paid under this Consent Order.

62. To preserve the deterrent effect of the civil money penalty in any Related Consumer Action, Respondent may not argue that Respondent is entitled to, nor may Respondent benefit by, any offset or reduction of any compensatory monetary remedies imposed in the Related Consumer Action because of the civil money penalty paid in this action or because of any


[EXHIBIT E]

payment that the Bureau makes from the Civil Penalty Fund (Penalty Offset). If the court in any Related Consumer Action grants such a Penalty Offset, Respondent must, within thirty (30) days after entry of a final order granting the Penalty Offset, notify the Bureau, and pay the amount of the Penalty Offset to the U.S. Treasury. Such a payment will not be considered an additional civil money penalty and will not change the amount of the civil money penalty imposed in this action.

## X

### Additional Monetary Provisions

**IT IS FURTHER ORDERED** that:

63.   In the event of any default on Respondent's obligations to make payment under this Consent Order, interest, computed under 28 U.S.C. § 1961, as amended, will accrue on any outstanding amounts not paid from the date of default to the date of payment, and will immediately become due and payable.

64.   Respondent must relinquish all dominion, control, and title to the funds paid to the fullest extent permitted by law and no part of the funds may be returned to Respondent.

65.   Under 31 U.S.C. § 7701, Respondent, unless it already has done so, must furnish to the Bureau its taxpayer identifying numbers, which may be used for purposes of collecting and reporting on any delinquent amount arising out of this Consent Order.

# [EXHIBIT E]

66. Within thirty (30) days of the entry of a final judgment, consent order, or settlement in a Related Consumer Action, Respondent must notify the Regional Director of the final judgment, consent order, or settlement in writing. That notification must indicate the amount of redress, if any, that Respondent paid or is required to pay to Consumers and describe the Consumers or classes of Consumers to whom that redress has been or will be paid.

## XI

## Reporting Requirements

**IT IS FURTHER ORDERED** that:

67. Respondent must notify the Bureau of any development that may affect compliance obligations arising under this Consent Order, including but not limited to a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Consent Order; the filing of any bankruptcy or insolvency proceeding by or against Respondent; or a change in Respondent's name or address. Respondent must provide this notice, if practicable, at least thirty (30) days before the development, but in any case no later than fourteen (14) days after the development.

68. Within ninety (90) days of the Effective Date, and again one year after the Effective Date, Respondent must submit to the Regional Director an

# [EXHIBIT E]

accurate written compliance progress report (Compliance Report) that has been approved by the Board, which, at a minimum:

a. Describes in detail the manner and form in which Respondent has complied with this Consent Order; and

b. Attaches a copy of each Order Acknowledgment obtained under Section XII unless previously submitted to the Bureau.

## XII

## Order Distribution and Acknowledgment

**IT IS FURTHER ORDERED** that,

69.  Within thirty (30) days of the Effective Date, Respondent must deliver a copy of this Consent Order to each of its board members as well as to any managers, employees, Service Providers, or other agents and representatives who have responsibilities related to the subject matter of the Consent Order.

70.  For five (5) years from the Effective Date, Respondent must deliver a copy of this Consent Order to any business entity resulting from any change in structure referred to in Section XI, any future board members or executive officers, as well as to any managers, employees, Service Providers, or other agents and representatives who will have responsibilities related to the subject matter of the Consent Order before they assume their responsibilities.

71.  Respondent must secure a signed and dated statement acknowledging receipt of a copy of this Consent Order, ensuring that any electronic

# [EXHIBIT E]

signatures comply with the requirements of the E-Sign Act, 15 U.S.C.

§§ 7001-7031, within thirty (30) days of delivery, from all persons receiving

a copy of this Consent Order under this Section.

## XIII

### Recordkeeping

**IT IS FURTHER ORDERED** that

72.  Respondent must create, or if already created, must retain for at least five

(5) years from the Effective Date, the following business records:

a.  All documents and records necessary to demonstrate full compliance

with each provision of this Consent Order, including all submissions to

the Bureau.

73.  Respondent must retain the documents identified in Paragraph 72 for the

duration of the Consent Order.

74.  Respondent must make the documents identified in Paragraph 72 available

to the Bureau upon the Bureau's request.

## XIV

### Notices

**IT IS FURTHER ORDERED** that:

75.  Unless otherwise directed in writing by the Bureau, Respondent must

provide all submissions, requests, communications, or other documents

relating to this Consent Order in writing, with the subject line, "*In re*

Transworld Systems, Inc., File No. Year-CFPB- 0018," and send them

either:

a.  By overnight courier (not the U.S. Postal Service), as follows:



[EXHIBIT E]

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017]

or

b. By first-class mail to the below address and contemporaneously by

  email to Enforcement_Compliance@cfpb.gov:

Regional Director, Bureau Northeast Region
Consumer Financial Protection Bureau
140 East 45th Street, 4th Floor
New York, NY 10017

## XV

## Cooperation with the Bureau

**IT IS FURTHER ORDERED** that:

76. Respondent must cooperate fully with the Bureau in this matter and in any

  investigation related to or associated with the conduct described in Section

  V. Respondent must provide truthful and complete information, evidence,

  and testimony and Respondent must cause its officers, employees,

  representatives, or agents to appear for interviews, discovery, hearings,

  trials, and any other proceedings that the Bureau may reasonably request

  upon ten (10) days written notice, or other reasonable notice, at such places

  and times as the Bureau may designate, without the service of compulsory

  process.

## XVI

## Compliance Monitoring


[EXHIBIT E]

**IT IS FURTHER ORDERED** that, to monitor Respondent's compliance with this Consent Order:

77.   Within fourteen (14) days of receipt of a written request from the Bureau, Respondent must submit additional Compliance Reports or other requested information, which must be made under penalty of perjury; provide sworn testimony; or produce documents.

78.   Respondent must permit Bureau representatives to interview any employee or other person affiliated with Respondent who has agreed to such an interview. The person interviewed may have counsel present.

79.   Nothing in this Consent Order will limit the Bureau's lawful use of civil investigative demands under 12 C.F.R. § 1080.6 or other compulsory process.

## XVII
### Modifications to Non-Material Requirements

**IT IS FURTHER ORDERED** that:

80.   Respondent may seek a modification to non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) by submitting a written request to the Regional Director.

81.   The Regional Director may, in his/her discretion, modify any non-material requirements of this Consent Order (*e.g.*, reasonable extensions of time and changes to reporting requirements) if he/she determines good cause justifies the modification. Any such modification by the Regional Director must be in writing.

29



## XVIII

### Administrative Provisions

82. The provisions of this Consent Order do not bar, estop, or otherwise prevent the Bureau, or any other governmental agency, from taking any other action against Respondent, except as described in Paragraph 83.

83. The Bureau releases and discharges Respondent from all potential liability for law violations that the Bureau has or might have asserted based on the practices described in Section V of this Consent Order, to the extent such practices occurred before the Effective Date and the Bureau knows about them as of the Effective Date. The Bureau may use the practices described in this Consent Order in future enforcement actions against Respondent and its affiliates, including, without limitation, to establish a pattern or practice of violations or the continuation of a pattern or practice of violations or to calculate the amount of any penalty. This release does not preclude or affect any right of the Bureau to determine and ensure compliance with the Consent Order, or to seek penalties for any violations of the Consent Order.

84. This Consent Order is intended to be, and will be construed as, a final Consent Order issued under section 1053 of the CFPA, 12 U.S.C. § 5563, and expressly does not form, and may not be construed to form, a contract binding the Bureau or the United States.

85. This Consent Order will terminate five (5) years from the Effective Date or five (5) years from the most recent date that the Bureau initiates an action alleging any violation of the Consent Order by Respondent. If such action is dismissed or the relevant adjudicative body rules that Respondent did not



[EXHIBIT E]

violate any provision of the Consent Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Consent Order will terminate as though the action had never been filed. The Consent Order will remain effective and enforceable until such time, except to the extent that any provisions of this Consent Order have been amended, suspended, waived, or terminated in writing by the Bureau or its designated agent.

86.   Calculation of time limitations will run from the Effective Date and be based on calendar days, unless otherwise noted.

87.   Should Respondent seek to transfer or assign all or part of its operations that are subject to this Consent Order, Respondent must, as a condition of sale, obtain the written agreement of the transferee or assignee to comply with all applicable provisions of this Consent Order.

88.   The provisions of this Consent Order will be enforceable by the Bureau. For any violation of this Consent Order, the Bureau may impose the maximum amount of civil money penalties allowed under section 1055(c) of the CFPA, 12 U.S.C. § 5565(c). In connection with any attempt by the Bureau to enforce this Consent Order in federal district court, the Bureau may serve Respondent wherever Respondent may be found and Respondent may not contest that court's personal jurisdiction over Respondent.

89.   This Consent Order and the accompanying Stipulation contain the complete agreement between the parties. The parties have made no promises, representations, or warranties other than what is contained in this Consent Order and the accompanying Stipulation. This Consent Order and the

# [EXHIBIT E]

accompanying Stipulation supersede any prior oral or written communications, discussions, or understandings.

90.   Nothing in this Consent Order or the accompanying Stipulation may be construed as allowing the Respondent, its Board, officers, or employees to violate any law, rule, or regulation.

**IT IS SO ORDERED**, this _15th_ day of September, 2017.

_Richard Cordray_
Richard Cordray
Director
Consumer Financial Protection Bureau

# [EXHIBIT E]

Yongmoon Kim (NJ Atty. ID #026122011)
Kɪᴍ Lᴀᴡ Fɪʀᴍ LLC
411 Hackensack Avenue, Suite 701
Hackensack, New Jersey 07601
Tel. & Fax (201) 273-7117
*Attorneys for Plaintiff*

| | |
|---|---|
| LESROY E. BROWNE, *on behalf of himself and those similarly situated,*<br><br>  Plaintiff,<br><br>        vs.<br><br>NATIONAL COLLEGIATE STUDENT LOAN TRUST A/K/A NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2003-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2004-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2005-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-3; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2006-4; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-1; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-2; NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-3 AND NATIONAL COLLEGIATE STUDENT LOAN TRUST 2007-4; WILMINGTON TRUST COMPANY AS TRUSTEE FOR NATIONAL COLLEGIATE STUDENT LOAN TRUST; U.S. BANK, N.A. IN ITS ROLE AS SPECIAL SERVICER FOR THE NATIONAL COLLEGIATE STUDENT LOAN TRUST; TRANSWORLD SYSTEMS, INC.; and JOHN DOES 1 to 15; and a class of Defendants similarly situated to the Defendant, National Collegiate Student Loan Trust.<br><br>  Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: HUDSON COUNTY<br><br>Civil Action<br><br><br>Docket No. HUD-L-1598-21<br><br><br>**CERTIFICATE OF SERVICE** |

I hereby certify that on this 21st day of April 2022, I caused a true and correct copy of the

First Amended Class Action Complaint and Jury Demand to be served on this date via electronic

mail, and First-Class Mail:

Christopher B. Fontenelli, Esq.
Gregory T. Casamento, Esq.
R. James DeRose III, Esq.
Andrew M. Braunstein, Esq.
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, New York 10281

J. Matthew Goodin, Esq.
LOCKE LORD LLP
111 South Wacker Drive, Suite 4100
Chicago, Illinois 60606

*Attorneys for Defendants National Collegiate Student Loan Trust 2003-1, National Collegiate Student Loan Trust 2004-1, National Collegiate Student Loan Trust 2004-2, National Collegiate Student Loan Trust 2005-1, National Collegiate Student Loan Trust 2005-2, National Collegiate Student Loan Trust 2005-3, National Collegiate Student Loan Trust 2006-1, National Collegiate Student Loan Trust 2006-2, National Collegiate Student Loan Trust 2006-3, National Collegiate Student Loan Trust 2006-4, National Collegiate Student Loan Trust 2007-1, National Collegiate Student Loan Trust 2007-2, National Collegiate Student Loan Trust 2007-3, National Collegiate Student Loan Trust 2007-4, National Collegiate Student Loan Trust 2009-1, and National Collegiate Master Student Loan Trust I*

*/s/ Yongmoon Kim*
Yongmoon Kim

DATED: April 21, 2022